Present: All the Justices

MELONI THOMAS

v. Record No. 090518     OPINION BY JUSTICE DONALD W. LEMONS
                                        January 15, 2010
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider multiple assignments of error

arising from Meloni A. Thomas' ("Thomas") convictions of first

degree murder and use of firearm in the commission of a

felony.

I. Facts and Proceedings Below[1]

Thomas was originally indicted for murder under Code

§ 18.2-32, armed statutory burglary under Code § 18.2-90, and

use of a firearm in commission of a felony under Code § 18.2-

53.1.[2] After a four-day jury trial, Thomas was found guilty

of both first degree murder and use of a firearm in the

commission of a felony and the jury fixed her punishment at 35

years imprisonment for first degree murder and three years

imprisonment for use of a firearm in the commission of a

---

[1] Thomas was tried separately from Cardell Lamont Avent ("Avent"), who was also charged and convicted for his participation in the crimes. See Avent v. Commonwealth, 279 Va. ___, ___ S.E.2d ___ (2010) (this day decided). Neither Avent nor Thomas testified at the other's trial. As a result, the evidentiary records in the two cases are inconsistent.

[2] The trial court granted the Commonwealth's motion for entry of nolle prosequi of Thomas' armed burglary charge, and Thomas was only tried on her indictments of murder and use of a firearm in commission of a felony.

felony, for a total sentence of 38 years imprisonment.  The trial court imposed the jury's verdict.

## A. Pre-trial Motions

Prior to trial, Thomas filed numerous motions including a motion to quash or dismiss her indictment for murder.  Thomas argued that the Virginia Model Jury Instructions allow a jury to infer malice, which "tends to cause [a] jury to ignore contrary evidence or tends to place a burden of persuasion on the defendant," and she argued that the jury instructions are thereby unconstitutional.  Thomas requested the trial court dismiss the indictment of murder against her or excise the language in the jury instructions that allows an inference of malice to be drawn by the jury.  The trial court denied Thomas' motion to quash the murder indictment but took the motion under advisement concerning jury instructions to be given at trial with regard to malice and murder.  Ultimately, the trial court gave three instructions on malice to the jury over Thomas' objection.

Thomas also filed 17 motions in limine.  Only the motions in limine relevant to this appeal will be addressed in this opinion.  First, Thomas requested that the trial court prohibit the Commonwealth "from using in the jury's presence the word 'murder' other than in argument as the same is conclusive, argumentative, and should be properly restricted

to opening or closing arguments." The trial court denied this motion "as to issuing any 'blanket prohibition' but cautioned both sides not to use language which would mislead, inflame, or prejudice the jury."

Second, Thomas requested that the trial court allow her to refer to potential punishment ranges during voir dire of the jury. The trial court ruled that neither Thomas nor the Commonwealth could "make reference to the range of punishment for any of the offenses prior to the penalty phase of the trial."

Third, Thomas moved the trial court to prohibit the Commonwealth from "display[ing] to the jury or introduc[ing] into evidence autopsy photographs/videotapes of the deceased or photographs/videotapes portraying the condition of the body of the deceased, during either the guilt phase or any necessary penalty phase, as the prejudicial effect of same outweighs any probative value." The trial court took this motion under advisement. However, during trial and after lengthy argument on this issue, the trial court ruled that the probative value of the photographs of the autopsy and the victim's remains outweighed the prejudicial effect of the photographs. Both the autopsy photographs and the photographs of the victim's remains were admitted into evidence.

Fourth, Thomas requested that the trial court prevent the Commonwealth from referring to or introducing evidence of an alleged prior assault or assault and battery by Thomas against the victim. Specifically, Thomas stated that "there was no trial and subsequent conviction" of the alleged assault or assault and battery and the evidence of such is "inadmissible to prove the offense charged at bar." The trial court made a preliminary ruling that the affidavit the victim had sworn out against Thomas was not admissible in evidence because it had not been served on Thomas until after the victim's death and there was no evidence that Thomas was aware of the affidavit. The trial court further stated that it would make its final ruling on the issue when the Commonwealth sought to introduce such evidence at trial.

Fifth, Thomas moved the trial court to prohibit "the Commonwealth from commenting on or seeking to introduce into evidence any and all statements made by Co-Defendant Cardell Avent tending to incriminate or inculpate" Thomas. Thomas and the Commonwealth "reached an understanding – which was affirmed by the Court that neither party would seek to introduce any portion of the statements of codefendant Avent . . . without filing a motion in limine and getting a further ruling from the Court."

Sixth, Thomas moved the trial court to order the Commonwealth to provide her with the "names, addresses, and telephone numbers" of the four prospective Commonwealth's witnesses who may be called to testify about allegedly inculpatory statements that Thomas made to them. Absent such a ruling by the trial court, Thomas requested that the trial court appoint "an investigator to assist the Defense in locating these prospective Commonwealth's witnesses for interview" because even though Thomas had previously contacted one of the prospective witness, "the Defense has no information regarding the current whereabouts of the other three witnesses and would face extreme difficulty in locating same to interview." The trial court denied both Thomas' motion for the "names, addresses, and telephone numbers" of all the Commonwealth's witnesses and her motion for a private investigator.

Finally, Thomas requested in both her motions in limine, and a separately filed ex parte motion, that the trial court order the production of criminal record checks of "any and all prospective Commonwealth witnesses" under Code § 19.2-389 and also requested "any juvenile criminal records of any and all prospective witnesses expected to testify for the Commonwealth." The trial court denied Thomas' requests for both the criminal and juvenile records of all potential

Commonwealth's witnesses.  Specifically, the trial court denied Thomas' motions "unless and until [Thomas] can show relevance of the criminal history check as to a particular witness."

### B. The Trial

After Thomas was arraigned, the trial court excluded two of Thomas' voir dire questions.  The two voir dire questions the trial court excluded read:

> 17. Meloni Thomas has been indicted, which indictment was based on evidence presented by the Commonwealth alone and none by the Defense. Does the existence of that indictment have any effect on anyone's opinion of the guilt or innocence of Meloni Thomas?  Would it cause anyone in any way to doubt the presumption of innocence the accused is afforded?

> . . . .

> 28. If any one of you were my client, would there be any reason you would not want yourself on the jury?

Thomas' attorney objected to the exclusion of the questions and argued that Thomas should be allowed to ask those voir dire questions.

The trial court then began the jury selection process. During voir dire, three prospective jurors raised their hands in response to Thomas' question, "[i]s there anyone who would give greater weight to the testimony of a police officer than to that of another witness or the accused simply because of

6

the officer's official status?"  The trial court questioned each of these three prospective jurors, and both the Commonwealth and Thomas were also allowed to further question these prospective jurors on their response.  After further questioning, the trial court struck one of the prospective jurors, Mary Dettre ("Dettre"), for cause, but allowed prospective jurors Lois Finch ("Finch") and David Heizer ("Heizer") to stay in the jury pool.

In the trial court's voir dire of Dettre, the trial court asked Dettre if she "would give greater weight to the testimony of a witness who was a police officer rather than to another witness, simply because the person was a police officer."  Prospective juror Dettre responded: "I kind of put police officers, sheriff's deputies on a pedestal, I guess you say" and that while she did think police officers could lie and make mistakes she would still "put more emphasis on [a police officer's] testimony."

When the trial court conducted voir dire of prospective juror Finch, she first responded that a police officer's job is "to tell the truth;" however, when asked further questions by the trial court, Finch stated that she did think police officers could lie and be mistaken and that she would "consider all the facts and circumstances surrounding the case."  Furthermore, Finch stated that she did not come to

7

court "predisposed" to "believe a police officer over other witnesses."

The trial court also conducted an individual voir dire of prospective juror Heizer. Heizer stated that he did think that police officers could lie and make mistakes and that he would not "automatically believe a police officer simply because he or she were a police officer." Heizer also stated that he "would listen to all the evidence from every witness that took the stand and any other evidence presented, and consider that all together before [he] reached a verdict." Finally, Heizer stated that he "would not believe a police officer because he was a police officer" but that "all other things being equal, and you have two people that have different testimonies, [he] would probably lean toward the police officer simply because [he] would hope that most police officers, it's their job to be impartial." The trial court struck prospective juror Dettre for cause but did not strike prospective jurors Finch and Heizer for cause, even over Thomas' motion to strike all three.

The Commonwealth's first witness, Major Brian Roberts, Jr. ("Major Roberts") of the Brunswick County Sheriff's Office, testified that, in response to a "missing persons" report, he went to the residence of William David Thomas ("William" or "the victim" or "father"). Major Roberts

testified that "[w]hen [he] first pulled into the driveway, [he] had [his] window down, and there was a horrific odor, like a rotting odor."

Two other sheriff's deputies were already on the scene, and Major Roberts testified that all three of them went into William's house and again stated that "there was a very stagnant odor in the air" but that he "couldn't really find out where that odor was" because "[i]t was so bad, you couldn't really draw a conclusion of where it was coming from." When Major Roberts entered William's residence, he saw "what appeared to be some blood droplets, bloodstains on the stairwell" and also some blood staining in the living room area and in the bathtub. Major Roberts testified that when he went upstairs to William's bedroom "it appeared to be a lot of blood there" that "appeared it had been smeared, possibly attempted to be cleaned up" with "some footprints or shoe prints in what appeared to be blood staining upstairs in the bedroom." After searching the house for William, Major Roberts testified that he and the other two deputies moved their search "out on the curtilage; so the surrounding yard, the outbuildings."

Major Roberts testified that while he was searching for William, he walked by a shed that "appeared to be like a chicken coop" and that "a big swarm of green flies c[a]me from

that building." In his experience and training, Major Roberts testified that he "knew that was the end result of maggots." Major Roberts described that the shed "had a cinder block propped up against the outside of the door as if it was to keep it closed" and "[t]here were some items that were kind of blocking the door. They were positioned to keep you from seeing into the door, is what it appeared to be." After removing a "blue like insulation" and "a big, black, plastic-looking thing that looked like a fender well," Major Roberts testified that there was "immediately . . . a huge pool of maggots and what appeared to be a human head."

Major Roberts testified that "[o]ne of the deputies, when we removed the items, started dry heaving" and that "[i]t was quite a horrific scene." Due to the body being "horribly decomposed," Major Roberts testified that he and the other deputies were not able to identify the body right away but that "[t]hrough dental records, the medical examiner's office" positively identified the victim as William.

The Commonwealth's Attorney asked Major Roberts about "a series of pictures" from the scene where William's body was found. The photographs illustrated different angles and shots of the shed and the victim's body in the shed, which Major Roberts described in his testimony. When the Commonwealth's Attorney moved for the admission of these photographs into

evidence, Thomas' attorney did not object to their admission, but then stated "[y]our Honor, I say no objection, but the matter was ruled on pretrial."  The trial court admitted all the photographs into evidence as Commonwealth's exhibits 1-4.

Captain Kent Washburn ("Captain Washburn")[3] of the Brunswick County Sheriff's Office corroborated Major Roberts' testimony that there were bloodstains throughout the victim's residence and that the bloodstains "got heavier as [he] went up the stairs . . . and in the bedroom there was a lot of dry blood all over the room."  Captain Washburn also testified that "fairly close to the [victim's] residence" there was a "well house" that appeared to have "bloodstains on the outside."  When Captain Washburn "pulled up" the rope in the "well house" there was "a five-gallon bucket, and in the bucket, was what appeared to have . . . a badly-stained shirt that appeared to have been blood on it.  In the chest area was a hole."

Trooper Steven Kean ("Trooper Kean"), a member of the Virginia State Police Search and Recovery Dive Team, testified that he responded with the dive team to the victim's home

---

[3] Captain Kent Washburn was referred to in the Thomas and Avent records as both "Captain Washburn" and "Lt. Washburn." For the purpose of consistency, we will refer to him as "Captain Washburn" in both this opinion and in Avent v. Commonwealth, 279 Va. ___, ___ S.E.2d ___ (2010) (this day decided).

where he spoke with Captain Washburn who informed him that the Brunswick County Sheriff's Department was "currently investigating a murder that had happened."  The dive team recovered a "fitted sheet, the blanket, a piece of metal that was wrapped up in [the blanket,] . . . a green towel, a striped towel, and part of a Winchester gun."

Dr. Bill Gormley ("Dr. Gormley"), a forensic pathologist and medical doctor, supervised the autopsy of William's body. Dr. Gormley testified that William's "cause of death is certified as blunt force injury to the head," that "there was extensive damage to particularly the head," and that the victim's "upper jaw was broken."  Dr. Gormley also testified that the victim had numerous shotgun pellet wounds but that "[n]o vital structures were damaged by [the] shotgun wound[s]" and that the shotgun wounds "together are potentially survivable."  In his testimony, Dr. Gormley used a "PowerPoint" presentation that included numerous pictures from the autopsy.  The trial court admitted the "PowerPoint" presentation with all the autopsy photographs into evidence, and Thomas' attorney did not object other than to remind the trial court of his pretrial objections.

Major Roberts testified that two suspects developed: Thomas – the victim's daughter – and Avent, Thomas' boyfriend. Captain Washburn testified that he was not able to locate

12

Thomas and Avent in Brunswick County, but that he "received a Crime Solvers tip" that Thomas, Avent, and Thomas' three children were in Kayenta, Arizona. Captain Washburn contacted the Kayenta Police Department, which confirmed that Thomas, Avent, and Thomas' three children were in fact in Kayenta, Arizona. Major Roberts and Captain Washburn then flew to Arizona to meet with Thomas and Avent, both of whom were being held in the Navajo County jail.

Major Roberts testified that he interviewed Thomas on September 3rd and 4th of 2005. After Thomas waived her Miranda rights, she gave Major Roberts a series of statements over the two days that she was interviewed. Thomas gave Major Roberts several written statements and Major Roberts audio recorded two interviews with Thomas. The trial court admitted the written statements and the audio recordings of Thomas' interview into evidence. Thomas did not object to the written statements or audio recordings being admitted into evidence or to the audiotapes being played for the jury.

When Major Roberts first interviewed Thomas, she told Major Roberts that she first learned of her father's death when she was arrested and that she did not ask how he died. However, Major Roberts testified that he confronted Thomas with information which indicated Thomas was lying about knowing when her father died. Thomas objected to this line of

13

questioning and argued that unrecorded statements should not be admitted into evidence. The trial court overruled Thomas' objection, and allowed Major Roberts to continue his testimony.

Major Roberts stated that Thomas admitted to him that Avent's sister "Cassandra" called Avent on August 18th "and told him about the death of [Thomas'] father while [she and Avent] were in Arizona." When it became apparent that Major Roberts was reciting what Thomas told him that Avent had told her, Thomas objected. After a proffer outside the presence of the jury, the trial court asked counsel to state the basis of the objection. Counsel stated: "As to getting into any statement made by Cardell Avent." Counsel further stated, "and I cannot cross-examine Cardell Avent." The trial court overruled the objection stating, "I don't see any hearsay in there . . . The description of the man isn't being used to prove the truth of it; the rest of it isn't being used to prove the truth of the statement. It's simply a response from Cardell Avent to her inquiry." Major Roberts testified that Thomas told him she had confronted Avent and asked him if he "had anything to do with it." Thomas told Major Roberts that Avent said "that David, being her father, was a piece of shit, that he took care of it, but he never said, yes, he did it. But she state[d], But I thought he could have killed him."

In Thomas' statements to Major Roberts, she admitted that on August 9, 2005, she went to her father's residence with Avent to obtain several of her "welfare checks" that were at her father's house. Thomas stated that she and Avent entered William's residence together through the backdoor of the residence. Thomas acknowledged that she and Avent did not have permission to be in William's home and that her father did not "let [her] or [Avent] into his house on August 9, 2005."

In one of Thomas' written statements,[4] she acknowledged that after she entered her father's home, she

> asked [her] dad for [her] checks he refused. [Avent] then pulled o[ut] a gun and made [her] dad go upstairs to get them. [Her] dad gave [her] the checks and him and [Avent] started arguing. [She] was at the top of the stairs and [Avent] shot him once. [She] got scared. [Avent] was yelling at [her] telling [her] he would kill [her] too. [Avent] was hitting [her] dad in the face with the gun. [Avent] told [her] to check on the kids in the car and when [she] came back into the house [her] dad's body was gone. [Avent] had moved his body. [Avent] told [her] to get [] cleaning supplies out of the kitchen. [She] gave them to [Avent] and he cleaned up most of the blood. [Avent] was running and throwing things in the well. [Avent] made [her] get a blue [and] white blanket and put it in the well. After that [she and Avent] left.

---

[4] Thomas gave several written statements to the police, which contain numerous grammatical and spelling errors; therefore, to avoid confusion, these errors have not been denoted using "[sic]."

Thomas supplemented her written statement with written answers to numerous written questions Major Roberts asked her.  In those written answers, Thomas further stated that

> [she] did not see the gun until [her] father met [her and Avent] at the steps and [she] asked for [her] checks and [William] said "NO" and then [Avent] pushed [her] aside and pulled out the gun and told [her] daddy to go get the checks, then [she and Avent] followed daddy up the steps to his bedroom and he got the checks from a desk or dresser behind his bed and he gave the checks to [Avent] and [Avent] gave them to [her] and [she] backed up to the top of the steps and [Avent] and daddy got to arguing . . . [Avent] shot [her] daddy one time and daddy fell beside the bed and [Avent] was on top of him and hitting [her] dad in the head and [Avent] hit him about 10 times at the most and it last for a couple of minutes then [Avent] told [her] to go check on the kids. When [she] went back into the house [her] dad's body was gone and [Avent] told [her] to get the cleaning supplies, then [she and Avent] started cleaning up, but [she] could not do much, because [she] got sick.  [Avent] was running in and out of the house getting stuff and putting it in the well.  [Avent] made [her] put the blue [and] white checkered blanket and put it in the well.  Then [she and Avent] left.

Throughout her statements, Thomas also maintained that she did not "see" that Avent had a gun until Avent had drawn the gun on William after William refused to give Thomas her checks. Thomas also described Avent's gun to Major Roberts as "a sawed off shotgun" that was "a single barrel," even though she only saw the gun "one time" and also added that the gun "had duc[t] tape" on it which is why she "knew it was a single barrel."

16

Thomas was asked if she "put [her] father in a shed after he was killed and shut the shed door," and Thomas responded, "[n]o, only [Avent] could have done it." Thomas also told Major Roberts that she drove the car from her father's residence and that she, Avent, and her children drove to a grocery store in North Carolina to cash the checks she obtained from her father. Before Thomas went into the grocery store, she changed clothes, then had "a woman named Jean" cash "one check." Thomas told Major Roberts that she then met John Bass in Roanoke Rapids, North Carolina "and gave him the other checks to be cashed." Thomas stated that she, Avent, and her children then drove to Arizona. When asked in a written question why she did not call the police, Thomas wrote that Avent "told [her] he would kill [her] if [she] told anybody."

While Thomas told the police Avent threatened her, she testified at trial that she did not go to the police or seek help because Avent threatened her and her children, and several of the Commonwealth's witnesses offered testimony demonstrating that Thomas had numerous opportunities to call the police or get help if she had so desired. Jean Chaney, who works in customer service at a grocery store, cashed one of Thomas' checks on the day in question, and she testified that Thomas came into the grocery store alone. Sharon Parish, who lived in Arizona and with whom Thomas, Avent, and Thomas'

17

children lived in Arizona, testified that the police station was about a quarter of a mile from their house, that Avent left Thomas and her children for two days while he went to work, and that Thomas and her children went with Sharon Parish at least once to a Wal-Mart without Avent. Finally, John Bass, who used to date Thomas, testified that he met Thomas on the day in question at a fast food restaurant, then took Thomas to a bank to get a check cashed, which took about 10 to 15 minutes. John Bass also stated that Thomas never asked him to call the police for her.

The Commonwealth also presented several witnesses, each of whom was either family or friends of Thomas, who testified that prior to the day in question, Thomas told them she wished her father was dead, that she hated him, that she would kill her father by poisoning him with rat poison or by shooting him, that "either she could do it, or she could get someone else to do it," and that she discussed several unsolved murders that occurred in Brunswick County. Page Barham, Thomas' cousin, testified that Thomas told her that on a prior occasion she broke into her father's residence "and she shot at him, and it hit the pillow." John Bass testified that on August 9, 2005, the day of the murder, Thomas told him she had a "scuffle" with her father and that "she was running with a

warrant on her."  Thomas' attorney did not object to this testimony.

At the close of the Commonwealth's case-in-chief, Thomas moved to strike the evidence against her.  Thomas argued: (i) there was insufficient evidence to find her guilty of murder as a principal in the second degree because there was no evidence that she encouraged or incited the principal in the first degree or that she shared an intent to kill with the principal in the first degree; (ii) there was insufficient evidence to find concert of action; (iii) there was insufficient evidence that Thomas possessed a firearm in the commission of a felony; and (iv) her case should proceed on a charge of accessory after the fact.  The trial court denied Thomas' motion to strike.

Thomas testified on her own behalf.  She addressed the comments she had made about wishing her father were dead and that she hated him by stating that she and her father had problems but that she did not "know one daughter that doesn't get mad at her dad or mom or guardian at one point of her life or another."  As to the day in question, Thomas testified that she went with Avent and her three children to her father's house to "get some child support checks that [William] had." Before arriving at her father's house, Thomas testified that she stopped by Avent's mother's house and Avent "put a duffle

19

bag in [her] trunk" but she did not see what was in the "duffle bag." Thomas maintained during her testimony that she did not "see" a gun in Avent's possession.

Thomas admitted to entering her father's home and that an argument ensued between her and her father. She testified at trial that Avent then "came up behind [her] and kind of pushed [her] out of the way" and "pull[ed] a gun . . . [f]rom his pants." According to Thomas, Avent "told [her] dad to get the 'F' up the stairs" to get Thomas' checks. Thomas and Avent followed William upstairs to his bedroom where William got Thomas' checks. Thomas testified that she then turned to go back down the stairs and she "heard the shotgun go off" one time and that she then went back "in the hallway" and Avent was standing over William "hitting him." Specifically, Thomas testified that Avent was hitting William in the head with the gun.

Thomas testified that she got "upset, really hysterical" and that Avent told her "to shut the 'F' up, or [she] would be next" and for her to "go check on the kids." Thomas then left her father's house, and went to her car to check on her children, and then moved the car "beside [her] father's truck which was behind the shed." After staying in the car "about ten minutes," Thomas testified that Avent was "cleaning up" and that he told her to get "two bottles of ammonia or bleach

20

and to go up the steps with them" and then he again threatened

Thomas and her children.  Thomas then testified that she

helped Avent "clean up," and that she followed Avent's

instructions by throwing a blue and white comforter "in the

well."

The following colloquy occurred between the

Commonwealth's Attorney and Thomas during Thomas' cross-

examination:

> Q    Having just seen your father shot and
> bludgeoned to death, why didn't you just drive
> out of the driveway with your three kids in the
> car, go to the police station?
> A    At that time, I wasn't thinking very
> clearly.  I had just witnessed the worst thing
> I had ever seen in my life.  I also had a
> choice to make.
> Q    What choice did you have to make?
> A    To put my kids' life in danger and my life
> in danger.
> Q    You thought they would be less in danger
> there with this man who had just bludgeoned
> your father and shot him; is that what you
> thought?
> A    No.  At the time, I wasn't thinking very
> clearly at all.

While Thomas testified that she "was under constant threats

from" Avent, during cross-examination the Commonwealth's

Attorney asked her when she was taken into custody in Arizona

if,

> at that point, you said, Oh, thank God, I have
> finally been saved from this.  Let me tell you
> what happened.  [Avent] has been threatening me
> for three weeks.  Is that what you said?
> A    No.

Q    But they were Arizona Officers.  How about
when Kent Washburn came, the man who had known
you all your life?  How about when he came and
asked you; you told him that, right? You said,
Kent, I am so glad to see you.  Let me tell you
what happened.  This man has been threatening
me.  Thank God you got my kids out of that
situation?

. . . .

A    No.

At the close of all the evidence, Thomas renewed her motion to strike for the same reasons given in her first motion to strike.  The trial court again denied Thomas' motion to strike.  Following discussion and argument about jury instructions, the trial court overruled Thomas' objections to the jury instructions on malice, inference of intent to cause the natural and probable consequences of an act, and flight and gave the jury instructions proffered by the Commonwealth.

Both the Commonwealth and Thomas presented closing arguments to the jury.  In the Commonwealth's closing argument, the Commonwealth made a reference to warrants that the victim had "out on" Thomas and that due to those warrants, Thomas did not have permission to be at her father's residence.  Thomas did not object to these comments.

The case was submitted to the jury after closing arguments, and the jury returned a guilty verdict for both

22

first degree murder and use of a firearm in the commission of a felony.

## C. Thomas' Appeal

Thomas appealed her conviction to the Court of Appeals, which denied Thomas' appeal by a per curiam order, Thomas v. Commonwealth, Rec. No. 0202-08-2 (Dec. 16, 2008), which was affirmed by a three-judge panel order, Thomas v. Commonwealth, Rec. No. 0202-08-2 (Feb. 17, 2008). Thomas timely appealed to this Court, and we granted her appeal on 15 assignments of error:

1. The Court of Appeals and the Trial Court erred in ruling that Defense Motions in Limine numbered nine and ten, and the Defense Ex Parte Motion pursuant to § 19.2-389, Code of Va., regarding criminal record checks, including juvenile criminal records, of prospective Commonwealth witnesses were not required to be furnished to the Defense by the Commonwealth and also in denying the Defense the ability to question such witnesses as to juvenile convictions of felonies or moral turpitude misdemeanors for general impeachment purposes because the 5th Amendment due process guarantee, 6th Amendment right of confrontation and effective assistance of counsel guarantees, and 14th Amendment, as well as similar provisions of the Virginia Constitution, trump any preference for confidentiality of juvenile records.

2. The Court of Appeals and the Trial Court erred in overruling the Defense Motion to Strike at the conclusion of the Commonwealth's Case-in-Chief, the Defense Motion to Strike at the conclusion of all the evidence, the Defense Motion to Set Aside the Verdict, and in granting principal in the second degree and concert of action jury instructions over Defense objection, because the evidence was insufficient to convict Defendant of first degree murder under § 18.2-32, and of use of firearm/murder under § 18.2-53.1, Code of Va.

3. The Court of Appeals and the Trial Court erred in overruling the Defense Motion at the conclusion of the

23

Commonwealth's Case-in-Chief to allow the case to proceed on an accessory after the fact murder theory and in refusing to grant a requested Defense instruction on that theory because the plain language of Va. Code § 19.2-286 and Supreme Court of Virginia Rule 3A:17(c), as well as the legislative history behind Code § 19.2-286, would plainly require a submission in the instant case to the jury on an accessory after the fact theory of liability and because the end result was inconsistent with Appellant's right to a fair trial.

4. The Court of Appeals and the Trial Court erred in denying the Defense Motion to Quash or Dismiss Indictment and in granting, over Defense objection, jury instructions permitting an inference of malice because the law as stated in these jury instructions unlawfully permits a conviction to be had based upon a presumption rather than proof and unlawfully shifts the burden of proof to an accused and are unconstitutional.

5. The Court of Appeals and the Trial Court erred in disallowing Defense proposed voir dire questions numbered 17 and 28 because the same were within Code of Va. § 8.01-358, Virginia Supreme Court Rule 3A:14, and resulted in a denial of due process, equal protection, effective assistance of counsel, and trial by impartial jury in violation of the 5th, 6th, and 14th Amendments of the U.S. Constitution and the equivalent guarantees of the Virginia Constitution.

6. The Court of Appeals and the Trial Court erred in overruling the Defense Motions to Strike for Cause prospective jurors David Heizer and Lois Finch because bias in favor of a government witness is grounds for a challenge for cause; and juror bias, whether presumed or proven, requires automatic reversal; and for the same grounds as set forth in number 5, supra.

7. The Court of Appeals and the Trial Court erred in denying the Defense [request] to refer to punishment ranges as to offenses in voir dire questioning of prospective jurors or in opening or closing argument because neither the Defense nor Prosecution could effectively screen prospective jurors for peremptory or for cause challenges and for the same constitutional grounds as set forth in numbers 5 and 6, supra.

8. The Court of Appeals and the Trial Court erred in overruling the Defense objection to the jury instruction regarding natural and probable consequences of one's acts.

24

The inference in such jury instruction eliminates the burden of proof on the Commonwealth to prove every element of an offense beyond a reasonable doubt, and unconstitutionally shifts the burden of proof regarding a defendant's criminal intent.

9. The Court of Appeals and the Trial Court erred in overruling the Defense objection to the flight instruction and, after deciding to give that instruction, in denying the proffered flight instruction from the Defense because the granting of the proposed Commonwealth flight jury instruction was an improper comment on the evidence, drew specific attention to something in evidence, amounted to the functional equivalent of a directed verdict, and unconstitutionally shifted the burden of proof regarding a defendant's criminal intent.

10. The Court of Appeals and the Trial Court erred in overruling the Defense objection to the testimony of Officer Brian Roberts as to incriminating statements allegedly made by defendant not within the three written statements or two audio recorded statements furnished by defendant to the police authorities because mitigating or exculpatory portions of statements made by defendant outside the three written statements and two recorded statements did not come into evidence along with the selected portions of such statements being testified to by Officer Roberts, the end result being a fundamental unfairness in trial.

11. The Court of Appeals and the Trial Court erred in denying the Defense request for the assistance of a private investigator because the same resulted in a denial of the 5th, 6th, and 14th Amendments guarantees of the U.S. Constitution and equivalent guarantees of the Virginia Constitution and Va. Code 10.2-163 [sic].[5]

12. The Court of Appeals and the Trial Court erred in not sustaining the Defense request for a pre-trial ruling prohibiting the Commonwealth from using in the jury's presence the word "murder" other than in argument, as the same is conclusive, argumentative, should be properly restricted to only opening or closing arguments, [and] was the ultimate issue with such testimony invading the province of the jury, resulting in fundamental unfairness of the trial.

---

[5] We note there is no Code § 10.2-163.

25

13. The Court of Appeals and the Trial Court erred in allowing the Commonwealth to display to the jury and introduce into evidence autopsy photographs of the deceased and photographs portraying the condition of the body of the deceased because the prejudicial effect of displaying such photographs outweighed the probative value.

14. The Court of Appeals and the Trial Court erred by allowing statements attributed to the co-defendant, Cardell Avent, into evidence over Defense objection which tended to incriminate or inculpate defendant because the same violated the pre-trial ruling regarding same and resulted in a violation of 5th Amendment due process, 6th Amendment right of confrontation, 14th Amendment, and the equivalent guarantees of the Virginia Constitution.

15. The Court of Appeals and the Trial Court erred in allowing the introduction into evidence by the Commonwealth in its Case-in-Chief and in its first closing argument of an alleged previous assault or assault and battery by appellant against the deceased because the prejudicial effect of this testimony and this argument outweighed its probative value and the same resulted in a violation of 5th Amendment due process, 6th Amendment right of confrontation and effective assistance of counsel, 14th Amendment, and the equivalent guarantees of the Virginia Constitution.

## II. Analysis

### A. Disclosure of Criminal Records of Commonwealth Witnesses

Thomas sought pretrial disclosure by the Commonwealth of the criminal records of several witnesses for the Commonwealth, including both adult and juvenile records. She acknowledges that Virginia law does not permit use of juvenile adjudications for the purpose of general impeachment of a witness' veracity on cross-examination, but she maintains that this Court should reconsider the question and hold that it was error in this case not to permit such use.

26

Code § 19.2-269 provides: "A person convicted of a felony or perjury shall not be incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit." However, in Kiracofe v. Commonwealth, 198 Va. 833, 844-45, 97 S.E.2d 14, 22 (1957), noting the unique status of a juvenile adjudication, we held that the trial court did not err in refusing to allow a juvenile adjudication to be used to impeach the general credibility of a witness. In the decades since Kiracofe, the United States Supreme Court has held that the Confrontation Clause requires that where pending juvenile proceedings support a defendant's specific effort to show bias or motivation of a prosecution witness to give testimony favorable to the government in a particular case, the policy of privacy for juvenile records must give way to the need for effective cross-examination to show the bias of the witness. Davis v. Alaska, 415 U.S. 308, 320 (1974)). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986). However, with respect to general conviction impeachment, not intertwined with an effort by the defendant to show bias of a witness in the particular case based upon the circumstances of pending

27

juvenile proceedings, the Confrontation Clause does not require disclosure or admission of juvenile records,[6] and we are not persuaded that a change in our jurisprudence is necessary on this subject and take this opportunity to reaffirm that juvenile adjudications may not be used for impeachment of a witness on the subject of general credibility.

Review of Thomas' several motions in limine relating to juvenile records demonstrates that she sought juvenile records as part of general impeachment preparations; bias or motivation was never identified as a justification.

---

[6] See Davis v. Alaska, 415 U.S. 308, 321 (1974) (Stewart, J., concurring) ("The Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions").  "The Sixth Amendment does not require the trial court to permit impeachment with juvenile adjudications unless they can be used to establish bias, not merely to challenge general credibility."  Tabron v. United States, 410 A.2d 209, 212 (D.C. 1979); Reid v. State, 888 A.2d 232, ¶¶ 16-18 (Del. 2005) (Table Case).  See generally Charles Alan Wright and Victor James Gold, FEDERAL PRACTICE & PROCEDURE § 6138 ("courts have been reluctant to extend [Davis v. Alaska] to justify admitting juvenile adjudications offered to impeach [generally].  It makes some sense to draw such a distinction between juvenile-adjudication evidence offered to impeach for bias and such evidence offered to impeach [which] undermines credibility only indirectly by showing a criminal character and, thus, a propensity which is only generally linked to truthfulness.  On the other hand, bias evidence shows the witness has a motive to lie in the specific case.  Thus, evidence offered to impeach . . . is less likely to do 'serious damage' to the prosecution's case than is bias evidence.")

Consequently, it is not necessary to address the production of such records where a bias-related purpose is shown.

Thomas also contends that she should have been provided the adult records of several of the Commonwealth's witnesses pursuant to Code § 19.2-389(38), which in pertinent part provides:

> Upon an ex parte motion of a defendant in a felony case and upon the showing that the records requested may be relevant to such case, the court shall enter an order requiring the Central Criminal Records Exchange to furnish the defendant . . . copies of any records of persons designated in the order on whom a report has been made under the provisions of this chapter.

In this case, Thomas has not identified in the trial court or on this appeal any prejudice allegedly flowing from the trial court's refusal to require production of these records; consequently, any error in such ruling would be harmless as a matter of law. Zektaw v. Commonwealth, 278 Va. 127, 139-40, 677 S.E.2d 49, 56 (2009); Pitt v. Commonwealth, 260 Va. 692, 695, 539 S.E.2d 77, 78 (2000).

## B. Sufficiency of the Evidence

When examining a challenge to the sufficiency of the evidence, an appellate court must review the evidence in the light most favorable to the prevailing party at trial and consider any reasonable inferences from the facts proved. Zimmerman v. Commonwealth, 266 Va. 384, 386, 585 S.E.2d 538,

539 (2003). The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is "plainly wrong or without evidence to support it." Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E. 2d 26, 28 (2005), Code § 8.01-680; Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004).

Code § 18.2-18 provides that, in the case of every felony (with the exception of certain murders), a principal in the second degree "may be indicted, tried, convicted and punished in all respects as if a principal in the first degree."

> A principal in the first degree is the actual
> perpetrator of the crime.  A principal in the
> second degree, or an aider or abettor as he is
> sometimes termed, is one who is present,
> actually or constructively, assisting the
> perpetrator in the commission of the crime.
> In order to make a person a principal in the
> second degree actual participation in the
> commission of the crime is not necessary. The
> test is whether or not he was encouraging,
> inciting, or in some manner offering aid in
> the commission of the crime.  If he was
> present lending countenance, or otherwise
> aiding while another did the act, he is an
> aider and abettor or principal in the second
> degree.

Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 33 (2005) (quoting Jones v. Commonwealth, 208 Va. 370, 372-73, 157 S.E.2d 907, 909 (1967)).  "[P]roof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other

30

circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same." Foster v. Commonwealth, 179 Va. 96, 100, 18 S.E.2d 314, 316 (1942). Additionally, as we recently held in McMorris v. Commonwealth:

> It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime.  This rule cannot be interpreted to mean that any overt act that is advantageous to the principal's criminal plan is sufficient; the defendant must also share in the principal's criminal intent. The overt act must be "knowingly in furtherance of the commission of the crime."  Therefore, lack of intent is usually a defense to a conviction as a principal in the second degree.  The one exception exists when there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act.

276 Va. 500, 505-06, 666 S.E.2d 348, 351 (2008) (citations omitted).

Defining concert of action in Brown v. Commonwealth, 130 Va. 733, 738, 107 S.E. 809, 811 (1921), we stated: "All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy,

are responsible for such incidental crime. . . . Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose." And in *Carter v. Commonwealth*, 232 Va. 122, 126, 348 S.E.2d 265, 267-68 (1986), we held:

> The Commonwealth's failure to prove that [the defendant] had advance knowledge of his co-actor's possession of a firearm is immaterial. The evidence warrants the inference that he was one of four men, acting in concert, who decided to rob [the victim]; that they followed him, surrounded him, and accosted him; that it then appeared to at least one of them that shooting [the victim] would be expedient for their common purpose, and that the shooting was done as an incident of that common purpose. In these circumstances, each co-actor is criminally responsible for the shooting, even those who did not intend it or anticipate that it would occur. Because they shared the common intent to rob, they shared the common intent to commit all of the elements of robbery, including the use of such force, violence, or intimidation as would be expedient for the accomplishment of their purpose. An incidental probable consequence of such a shared intent was the use of a weapon, including a firearm if one should be at hand. In such circumstances, the law is well settled in Virginia that each co-actor is responsible for the acts of the others, and may not interpose his personal lack of intent as a defense.

Thomas had expressed to others her hatred of her father and her intent to kill him herself or to procure someone to do it for her. The evidence revealed a prior occasion upon which she fired a weapon at her father. She had been forbidden to come to her father's home; nonetheless, on the day of the murder she and Avent arrived at the house and entered through the back door without permission. They were intent upon obtaining welfare checks for Thomas which were being held by her father.

Thomas maintained that she did not know that Avent had a weapon when they went into the back door without permission. She testified that she and Avent had stopped at Avent's mother's house before going to Thomas's father's house. Avent put a duffle bag in the trunk of the automobile, but Thomas maintained that she did not know what was in the duffle bag. Upon entry to the home, an argument ensued regarding the welfare checks and Thomas' father refused to give her the checks. She stated that at that time Avent pushed her aside and pulled the weapon from his pants. The weapon was a sawed-off shotgun. The jury was entitled to disbelieve Thomas' assertion that she did not know Avent had a weapon when they entered the home. The jury was entitled to conclude that it was implausible that Thomas would not have seen Avent retrieve the weapon from the duffle bag in the trunk, if that is how he

33

obtained it, or that she would not have known of a shotgun in his pants, if that is how he transported it in the car and to her father's home.

Avent ordered William to go up the stairs to get Thomas' checks. Both Avent and Thomas followed him up the stairs at gunpoint. The jury was entitled to conclude that both Avent and Thomas intended to force William to surrender the checks by threat of violence or actual violence. Thomas was present when the murder was committed and did not intervene. Expert testimony established that William did not die from the gunshot wound; rather, he died from a particularly vicious beating with the sawed-off shotgun. The injuries were horrific and the beating so savage that the weapon broke apart. Thomas did nothing to intervene. Thereafter, she assisted Avent in the disposal of the body and an attempt to clean the crime scene and hide evidence.

Thomas claimed that she acted under duress. But the jury was entitled to conclude that her failure to reveal the crime or to flee Avent and inform the police when she had several opportunities to do so, undermined any claim that she was fearful of him.

Thomas' shared intent to kill was demonstrated by several statements made to acquaintances that she wished her father were dead, would kill him herself or have someone else kill

him, and by her admission that she had attempted to shoot him. Knowing that her father had forbidden her to come to his home and that he would resist her efforts to obtain her welfare checks, she and Avent entered the back door without permission. It is reasonable to conclude that she knew there would be a confrontation and that violence may result. Because of inherent implausibility, the jury was entitled to disbelieve her denial that she knew Avent had a sawed off shotgun when they entered the home.

Even if there were a question about Thomas' shared intent to kill her father, a lack of shared intent is not a defense to aiding and abetting liability when concert of action is proved. Here there was sufficient evidence of concert of action. Avent and Thomas arrived at her father's home knowing that they were forbidden to be there. They gained entrance through the back door. They were intent upon forcing her father to surrender the welfare checks. When he refused, they pursued him up the stairs where he was shot and brutally beaten. As in Carter, the violence, in this case the shooting and beating, were "done as an incident of [a] common purpose." Thomas and Avent shared the intent to "use . . . such force, violence, or intimidation as would be expedient for the accomplishment of their purpose." Id. at 126, 348 S.E.2d at 267. As in Carter, "[a]n incidental probable consequence of

such a shared intent was the use of a weapon, including a firearm if one should be at hand. In such circumstances, the law is well settled in Virginia that each co-actor is responsible for the acts of the others, and may not interpose . . . personal lack of intent as a defense."  Id.

The trial court did not err in holding that the evidence was sufficient for the jury to find Thomas guilty of first degree murder and use of a firearm in the commission of a felony.

### C.  Accessory After the Fact Instruction

Thomas argues that the trial court erred in refusing to allow her to proceed on the theory that she was an accessory after the fact and refusing an instruction that would have permitted the jury to make this finding.

In Commonwealth v. Dalton, 259 Va. 249, 255, 524 S.E.2d 860, 863 (2000) we analyzed both Code § 19.2-286 and Rule 3A:17(c) and concluded that "before a defendant can be tried and convicted of being an accessory after the fact, he must be charged with that offense.  Unless such a charge is specifically made, neither the Commonwealth nor an accused is entitled to an accessory-after-the-fact instruction."  259 Va. at 255, 524 S.E.2d at 863.  Accessory after the fact is not a lesser included offense of murder. Id. at 254, 524 S.E.2d at

863.  The trial court did not err in following the clear holding in Dalton.

###### D.   Jury Instructions Concerning Malice

Thomas argues that the Court of Appeals erred when it affirmed the trial court's denial of her pre-trial motion to quash, the trial court's denial of her jury instruction on malice, and the trial court's grant of jury instructions on an inference of malice.  While Thomas acknowledges that current Virginia law entitles the Commonwealth to jury instructions on an inference of malice, she argues that such an inference is an unconstitutional presumption under Sandstrom v. Montana, 442 U.S. 510 (1970), and that giving the malice jury instructions is reversible error.

We have previously addressed all of Thomas' arguments with regard to the constitutionality of instructing the jury on an inference of malice in a murder case.  See Strickler v. Commonwealth, 241 Va. 482, 495-96, 404 S.E.2d 227, 235-36 (1991); Smith v. Commonwealth, 239 Va. 243, 263-64, 389 S.E.2d 871, 872 (1990).  Specifically, we held constitutional in Strickler jury instructions that stated, "that malice could be 'inferred from any deliberate wilful [sic] and cruel act against another, however sudden,' " and jury instructions that stated a jury " 'may infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a

37

reasonable doubt as to whether malice existed.' "  241 Va. at 495-96, 404 S.E.2d at 235-36.

Here, the trial court granted three jury instructions on malice.  Instruction Number 9 read:

> Malice is the state of mind which results in the intentional doing of a wrongful act to another without legal excuse or justification, at a time when the mind of the actor is under the control of reason.  Malice may result from any unlawful or unjustifiable motive including anger, hatred or revenge.  Malice may be inferred from any deliberate willful and cruel act against another, however sudden.

Instruction Number 10 read:

> You may infer malice from the deliberate use of a deadly weapon, unless, from all the evidence, you have a reasonable doubt as to whether malice existed.
>
> A deadly weapon is any object or instrument, not part of the human body, that is likely to cause death or great bodily injury because of the manner and under the circumstances in which it is used.

Instruction Number 11 read:

> Once the Commonwealth has proved there was an unlawful killing, then you are entitled to infer there was malice unless, from all the evidence, you have a reasonable doubt as to whether malice existed.

The trial court did not err in granting these jury instructions.  Instructions 9 and 10 are verbatim the instructions we held in <u>Strickler</u> were constitutional and not error to grant.  241 Va. at 495-96, 404 S.E.2d at 235-36.

38

Instruction 11 is within the holding of <u>Hodge v. Commonwealth</u>, 217 Va. 338, 344, 228 S.E.2d 692, 696 (1976), that an "inference of malice arising from the commission of an unlawful homicide is clothed with the due process safeguards required" and that "the inference must be sufficient for a rational juror to find the presumed or inferred fact beyond a reasonable doubt." <u>Id.</u> Furthermore, the trial court did not err in denying Thomas' pretrial motion to quash or dismiss Thomas' murder charge because the Commonwealth is entitled to an inference on malice. <u>See</u> <u>Strickler</u>, 241 Va. at 495-96, 404 S.E.2d at 235-36; <u>Smith</u>, at 263-64, 389 S.E.2d at 882; <u>Hodge</u>, 217 Va. at 344, 228 S.E.2d at 696-97.

      E.  Defendant's Proposed Voir Dire Questions

Thomas submitted a list of 29 proposed voir dire questions. The trial court permitted Thomas to ask all but two – numbers 17 and 28. The two excluded questions read:

> 17. Meloni Thomas has been indicted, which indictment was based on evidence presented by the Commonwealth alone and none by the Defense. Does the existence of that indictment have any effect on anyone's opinion of the guilt or innocence of Meloni Thomas? Would it cause anyone in any way to doubt the presumption of innocence the accused is afforded?
>
>         . . . .
>
> 28. If any one of you were my client, would there be any reason you would not want yourself on this jury?

The trial court permitted the statement at the outset of item 17 and allowed the second question posed within it, but disallowed the first question.  Thomas argues that the trial court erred in excluding the first question in proposal 17, and in excluding the proposed question in 28, because they seek to probe a prospective juror's interest or bias within the scope of Code § 8.01-358.

We review a trial court's decision to exclude voir dire questions for an abuse of discretion.  See Bassett v. Commonwealth, 222 Va. 844, 853, 284 S.E.2d 844, 850 (1981).  A defendant has "no absolute right to have the court ask every question he propounded."  Id.  Code § 8.01-358, controlling voir dire questions, states in relevant part:

> The court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein.

We have stated that

> [t]rial courts must afford a party a "full and fair" opportunity to ascertain whether prospective jurors "stand indifferent in the cause."  LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), cert. denied, 464 U.S. 1063 (1984).  However, it is within the trial court's sound discretion to decide when a defendant has had such an

40

opportunity.  <u>Id.</u>, 304 S.E.2d at 653. . . .  To be permissible, counsel's questions must be relevant in that they are such as would necessarily disclose or clearly lead to the disclosure of relationship, interest, opinion, or prejudice.  <u>See</u> Code § 8.01-358.  Where a trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel.  <u>See</u> <u>LeVasseur</u>, 225 Va. at 582, 304 S.E.2d at 653; <u>Mackall v. Commonwealth</u>, 236 Va. 240, 251, 372 S.E.2d 759, 766 (1988), <u>cert.</u> <u>denied</u>, 492 U.S. 925 (1989).

<u>Buchanan v. Commonwealth</u>, 238 Va. 389, 401, 384 S.E.2d 757, 764 (1989).

That portion of proposed question 17 which was disallowed was amply covered by other questions asked by the trial court, such as:

Do you understand and can you agree with the principle, one of the foundations of our laws, that the defendant is presumed to be innocent?

Do you understand and can you agree with the principle in our law that the Commonwealth must prove the defendant's guilt beyond a reasonable doubt?

The trial court therefore did not abuse its discretion in refusing a portion of proposed voir dire question 17.

Proposed voir dire question 28 posed an open-ended question to the prospective jurors likely to generate speculative and irrelevant responses.  "[T]rial courts are not required to allow counsel to ask questions which are so

41

ambiguous as to render the answers meaningless." Id.

Furthermore, the trial court amply addressed the issue in its

own questions:

> Are you aware or sense any bias or prejudice either against the Commonwealth or the accused?

> Do anyone of you know of any reason whatsoever why you cannot give a fair and impartial trial, both to the Commonwealth and to the accused, Meloni Thomas, based solely on the law which I will give you and the evidence you will hear?

Therefore, the trial court did not abuse its discretion in

excluding Question 28.

F.   The Trial Court's Refusal to Strike Two Jurors for Cause

> On appellate review, we give deference to the trial court's determination whether to exclude a prospective juror, because the trial court was able to see and hear each member of the venire respond to the questions posed. Thus, the trial court is in a superior position to determine whether a juror's responses during voir dire indicate that the juror would be prevented or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath. Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000); Stewart v. Commonwealth, 245 Va. 222, 234, 427 S.E.2d 394, 402, cert. denied, 510 U.S. 848 (1993). A trial court's decision on this issue will not be disturbed on appeal absent a showing that the trial court abused its discretion. Vinson, 258 Va. at 467, 522 S.E.2d at 176;, Roach, 251 Va. at 343, 468 S.E.2d at 109.

> In conducting our review, we consider the juror's entire voir dire, not merely isolated statements. Vinson, 258 Va. at 467, 522 S.E.2d

42

at 176; Clagett, 252 Va. at 90, 472 S.E.2d at 269; Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989).

Lovitt v. Commonwealth, 260 Va. 497, 510-11, 537 S.E.2d 866, 875 (2000).

During voir dire, three prospective jurors raised their hands in response to Thomas' question, "[i]s there anyone who would give greater weight to the testimony of a police officer than to that of another witness or the accused simply because of the officer's official status."  The trial court carefully questioned each of these three prospective jurors and both the Commonwealth and Thomas were also allowed to further question these prospective jurors on their responses.  After further questioning, the trial court struck one of the prospective jurors for cause, but allowed prospective jurors Finch and Heizer to stay in the jury pool.  Thomas argues on appeal that the trial court erred in not also striking Finch and Heizer for cause as to their answers on the weight of an officer's testimony.

After reviewing the voir dire as a whole and without repeating the specifics which are recited in "Section I" of this opinion, we hold that the trial court did not err in retaining prospective jurors Finch and Heizer in the jury pool.  Both Finch and Heizer were able to answer the trial

court's questions and both attorneys' questions in a manner that demonstrated their ability to be fair and impartial jurors.  Therefore, we hold that the trial court did not abuse its discretion in keeping Finch and Heizer in the jury pool and not striking them for cause.

G. Comment or Inquiry Regarding Range of Punishment in Voir Dire or Opening Statements and Closing Arguments

Thomas argues that she could not "effectively screen jurors for peremptory or for cause challenges" without referring to the punishment ranges. However, we unequivocally held in Commonwealth v. Hill, 264 Va. 315, 320, 568 S.E.2d 673, 676 (2002), that

> neither the defendant nor the Commonwealth in a non-capital criminal prosecution has a constitutional or statutory right to ask the members of a jury panel questions about the range of punishment that may be imposed upon a defendant if he is ultimately convicted of the crimes charged or of lesser included offenses.

In a non-capital case, reference to statutory punishment ranges is not relevant to the proper seating of a jury or to any matters at issue in the guilt or innocence stage of a felony proceeding in Virginia. Consequently, the trial did not err in holding that Thomas could not refer to punishment ranges in her voir dire of the jury or in opening statement or closing argument in the guilt or innocence stage of the proceedings.

H. Instruction Regarding Permissible Inference of a Defendant's Intent to Cause the Natural Consequences of Their Acts

The jury was instructed that: "You may infer that every person intends the natural and probable consequences of his acts." Thomas maintains that such an instruction "is the

45

functional equivalent of a directed verdict," and "shifts the burden of proof regarding a defendant's criminal intent."

We have previously addressed this question in <u>Schmitt v. Commonwealth</u>, 262 Va. 127, 145, 547 S.E.2d 186, 198-99 (2001). In <u>Schmitt</u>, we approved a jury instruction stating that "[i]t is permissible to infer that every person intends the natural and probable consequences of his or her acts" and that such an inference "did not establish an improper presumption but merely stated a permissive inference." <u>Id.</u> We further explained that "[u]nlike conclusive or burden shifting presumptions regarding a defendant's criminal intent, which are constitutionally invalid, the present instruction did not require the jurors to draw any inference or alter the Commonwealth's burden of proving [the defendant's] criminal intent beyond a reasonable doubt." <u>Id.</u> at 145, 547 S.E.2d at 199.

Here, the concert of action instruction, Number 16, read: "You may infer that every person intends the natural and probable consequences of his acts." This jury instruction is almost identical to the jury instruction given in <u>Schmitt</u>. Therefore, the trial court did not err in granting Instruction Number 16 on concert of action and permissible inferences.

I.  Instruction Regarding Flight

The Commonwealth offered Instruction Number 19, which

read:

> If a person leaves a place where a crime
> was committed, or flees to avoid detection,
> apprehension or arrest; this creates no
> presumption that the person is guilty of having
> committed the crime.  However, it is a
> circumstance which you may consider along with
> the other evidence.

(Emphasis added.)  Thomas' proffered jury instruction on

flight, Instruction No. R-3, read:

> If a person leaves a place where a crime
> was committed, this creates no presumption that
> the person is guilty of having committed the
> crime.  However, it is a circumstance which you
> may consider along with the other evidence.
> In your consideration of the evidence of
> flight, you should consider that there may be
> reasons for that which are fully consistent
> with innocence.  Those may include fear of
> being apprehended, unwillingness to confront
> police, reluctance to appear as a witness, or
> being under duress or threat.

(Emphasis added.)

The trial court ultimately accepted the Commonwealth's

instruction.  During trial, Thomas' attorney objected to the

Commonwealth's flight instruction on the basis that

> the model jury instruction on flight, which you
> intend to give, my position would be it's an
> improper comment on the evidence.  It's drawing
> attention to something specifically in
> evidence, and it's the functional equivalent of
> a directed verdict.  It shifts the burden of
> proof regarding a defendant's criminal intent.

47

On appeal, Thomas additionally argues that this Court held in

Turman v. Commonwealth, 276 Va. 558, 667 S.E.2d 767 (2008)

that the Model Jury Instruction on flight – that is utilized

in this case as well – was defective and therefore the trial

court committed reversible error in granting the instruction.

We held in Turman that the phrase "if a person leaves the

place where a crime was committed" is "overly broad" and

results in an incorrect statement of the law.  276 Va. at 563,

566, 667 S.E.2d at 771.  However, in the present case Thomas'

proffered flight instruction contained the same phrase as both

the Commonwealth's proffered flight instruction and the flight

instruction in Turman that was held to be error.  The

defendant cannot be heard to complain about an error in an

instruction given that is also contained in the instruction

she proffered as an alternative.[7]

---

[7] See generally Breard v. Commonwealth, 248 Va. 68, 83–84, 445 S.E.2d 670, 679 (1994) (relief on appeal not available where the prosecution and defense's "two instructions were essentially identical"); Smith v. Commonwealth, 136 Va. 677, 682, 116 S.E. 246, 248 (1923) (even if "it would have been proper" to grant a different instruction, where the trial court did in substance what the defendant has requested in an instruction, no reversible error is found); Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) ("The defendant's instruction was no more or less correct than the instruction given").  See also McBride v. Commonwealth, 44 Va. App. 526m 530–31, 605 S.E.2d 773, 775 (2004) (reversal will not follow where defendant's own tendered instructions invited the error raised on appeal); Levy v. Davis, 115 Va. 814, 820, 80 S.E. 791, 793 (1914).

Furthermore, in Turman we observed that the "record is simply devoid of more than a scintilla of evidence that Turman left the victim's apartment after the sexual acts had occurred because he sought to avoid detection, apprehension, arrest, or criminal prosecution." Id. at 565, 667 S.E.2d at 771. By contrast, this record is replete with evidence from which such an inference of guilt may be drawn from flight. As we stated in Anderson v. Commonwealth, 100 Va. 860, 863, 42 S.E. 865, 865 (1902):

> When a suspected person attempts to escape or evade a threatened prosecution, it may be argued that he does so from consciousness of guilt; and though the inference is by no means strong enough by itself to warrant a conviction, yet it may become one of a series of circumstances from which guilt may be inferred. An attempt to escape or evade prosecution is not to be regarded as a part of the res gestae, but only as a circumstance to be considered by the jury along with the other facts and circumstances tending to establish the guilt of the accused. The nearer, however, to the commission of the crime committed, the more cogent would be the circumstance that the suspected person attempted to escape, or to evade prosecution, but it should be cautiously considered, because it may be attributable to a number of other reasons, than consciousness of guilt.

See also Turman, 276 Va. at 564-65, 667 S.E.2d at 770.

### J. Admission in Evidence of Thomas' Oral Statements to Police

In reviewing the admissibility of evidence, we apply an abuse of discretion standard of review. Ortiz v.

49

<u>Commonwealth</u>, 276 Va. 705, 712, 667 S.E.2d 751, 756 (2008). Thomas argues that the trial court erred in allowing Major Roberts to testify about unrecorded statements Thomas made to him while she was being interrogated. Thomas' main objection to the use of the unrecorded statements is that the jury was not able to see or hear all the statements she made to the police and in what context her statements were made. Accordingly, Thomas argues that allowing Major Roberts to testify about those unrecorded statements was fundamentally unfair to her trial because, in addition to the statements against her penal interest, Thomas also could have made exculpatory or mitigating statements.

During Major Roberts' testimony, Thomas' attorney conceded that the Commonwealth provided Thomas with Major Roberts' notes, which contained statements Thomas made to police. When Thomas objected to Major Roberts testifying about several unrecorded statements Thomas made to him during his interrogation of her, Thomas did not proffer any testimony about any statements Thomas made to Major Roberts that were exculpatory or mitigating. Furthermore, Thomas testified on her own behalf, and did not testify about any statements she made to the police that were exculpatory or mitigating.

From the arguments made by Thomas, it is difficult to discern the legal argument in support of her claim of error.

50

In any event, we are unable to reach the question because the lack of proffers of what would have placed these statements in context or what might have been exculpatory, makes it impossible to determine if any alleged error was harmful. O'Dell v. Commonwealth, 234 Va. 672, 697, 364 S.E.2d 491, 505 (1988).

### K. Denial of Request for Private Investigator

Thomas argues that the trial court erred in denying her request for a court-appointed private investigator to assist her in "locating [the Commonwealth's] witnesses for interview by Defendant's Counsel," so that Thomas would "be able to effectively confront the witnesses against her" and so that her counsel could provide "effective assistance of counsel."

We have long held that

> a defendant does not have an absolute right to the assistance of an investigator, even when charged with capital murder. Bailey v. Commonwealth, 259 Va. 723, 737, 529 S.E.2d 570, 578 (2000). Instead, as with any request for the appointment of an expert, a defendant "must show a particularized need" by establishing "that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." Husske v. Commonwealth, 252 Va. 203, 212-13, 476 S.E.2d 920, 925-26 (1996). The determination whether a defendant has made an adequate showing of particularized need for expert assistance lies within the sound discretion of the trial court. Id.; see also Lenz v. Commonwealth, 261 Va. 451, 462, 544 S.E.2d 299, 305, cert. denied, 534 U.S. 1003

51

(2001); Bailey, 259 Va. at 737, 529 S.E.2d at 578.

. . . .

A particularized need is more than a "mere hope" that favorable evidence can be obtained through the services of an expert. Husske, 252 Va. at 212, 476 S.E.2d at 925-26.

Green v. Commonwealth, 266 Va. 81, 91-92, 580 S.E.2d 834, 840-41 (2003).

Thomas requested, as in Green, a court-appointed private investigator to locate witnesses so that she could effectively cross-examine those witnesses. As in Green, we hold that Thomas' request for the appointment of a private investigator "fell 'far short of demonstrating a particularized need for the services of an expert.' " Id. at 92, 580 S.E.2d at 840-41. Thomas had the advantage of knowing most of the Commonwealth's witnesses who would testify against her because they were either her friends or family. Thomas' attorney could have located and interviewed these witnesses without the need of a private investigator.

Recently, we restated the threshold requirements for appointment of an investigator to assist the defendant. In Dowdy v. Commonwealth, 278 Va. 577, 594-95, ___ S.E.2d ___, ___ (2009), we stated that the defendant "has the burden to make a 'particularized showing of the need' for such

52

assistance" and that the sufficiency of such a showing "is determined on a case-by-case basis, and the determination is a matter resting within a trial court's discretion." Thomas' request was generalized and not particularized. Id. at 595, ___ S.E.2d at ___. The trial court did not abuse its discretion by denying the motion.

L. Use of the term "Murder" at Trial

Thomas argues that the trial court erred when it denied her pre-trial motion requesting that the Commonwealth be prohibited from using the word "murder" in the presence of the jury because use of the word was "conclusive, argumentative" and should have only been used in opening and closing argument. This evidentiary question is reviewed for an abuse of discretion. Ortiz, 276 Va. at 712, 667 S.E.2d at 756.

Thomas contends this became an issue at trial when Trooper Kean from the state police search and recovery dive team testified that when he arrived at the scene of the incident "[Captain] Washburn . . . stated they were currently investigating a murder that had happened." Thomas argues that allowing Trooper Kean to use the word "murder" resulted in a fundamentally unfair trial and denied her due process of law.

The jury clearly knew that they were jurors at a murder trial. The question at issue was whether Thomas had committed the murder. The trial court did not abuse its discretion in

53

denying Thomas' motion in limine seeking that the use of the word "murder" be limited to opening and closing argument. Even though the trial court did not specifically restrict the Commonwealth from using the word "murder," the trial court did caution "both sides not to use language which would mislead, inflame, or prejudice the jury."

      M.  Introduction of Photographs of the Victim

We review the admissibility of evidence under an abuse of discretion standard of review.  Ortiz, 276 Va. at 712, 667 S.E.2d at 756.

> Accurate photographs of a crime scene are not rendered inadmissible solely because they are gruesome . . . Juniper, 271 Va. at 413, 626 S.E.2d at 415-16, Walton v. Commonwealth, 256 Va. 85, 92, 501 S.E.2d 134, 138, cert. denied, 525 U.S. 1046 (1998).  Such photographs must nevertheless be excluded if their prejudicial effect substantially outweighs their probative value.  Walker v. Commonwealth, 258 Va. 54, 69, 515 S.E.2d 565, 574 (1999), cert. denied, 528 U.S. 1125 (2000).

Teleguz v. Commonwealth, 273 Va. 458, 482, 643 S.E.2d 708, 723 (2007).  Furthermore, we have stated that

> [p]hotographs and videotapes of crime scenes are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime.  Spencer v. Commonwealth, 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), cert. denied, 493 U.S. 1093 (1990); Stamper v. Commonwealth, 220 Va. 260, 270-71, 257 S.E.2d 808, 816 (1979), cert. denied, 445 U.S. 972 (1980).  If the photographs accurately depict the crime scene, they are not rendered inadmissible simply because they are gruesome

54

> or shocking. <u>Gray v. Commonwealth</u>, 233 Va.
> 313, 343, 356 S.E.2d 157, 173, <u>cert.</u> <u>denied</u>,
> 484 U.S. 873 (1987).

<u>Goins v. Commonwealth</u>, 251 Va. 442, 459, 470 S.E.2d 114, 126 (1996).

Thomas argues that the trial court erred in admitting photographs of the victim because the prejudicial value outweighed the probative value.  Thomas concedes that she did not object to photographs of the shed where the victim's body was found or photographs of the victim's skull that depicted "the blunt force trauma to the [victim's] head."  However, Thomas argues that the photographs of the victim's body were more prejudicial than probative due to the "state of decomposition" of the victim's body.  After lengthy argument on this issue, the trial court determined that the probative value of the autopsy photographs and the photographs showing the victim's body outweighed the prejudicial effect.

Major Roberts, who laid the foundation for the photographs of the victim's body in the shed, used the photographs to demonstrate to the jury how he found the victim's body that had been hidden in what he described as a "chicken coop" behind a "black fender well" and a door.  Also, Dr. Bill Gormley, the testifying forensic pathologist, used the autopsy photographs to explain to the jury the nature and

extent of victim's injuries – both the shotgun wound and the lethal head trauma.

Even though the photographs were graphic and gruesome, the photographs demonstrated both the method and violence of the crime and that the body was hidden.  As noted above, evidence with probative value may be excluded only if its prejudicial effect substantially outweighs the probative value.  Teleguz, 273 Va. at 482, 643 S.E.2d at 723; Walker, 258 Va. at 69, 515 S.E.2d at 574.  In this case, the trial court did not abuse its discretion in admitting photographs of the victim's body.

### N.   Admission of Statements by Avent

Thomas argues that the trial court allowed Major Roberts to testify about two statements made by Avent.  The trial court ruled on Thomas' motion in limine by stating that "neither side would seek to introduce any portion of the statements of codefendant Avent . . . without filing a motion in limine and getting a further ruling from the Court."  The two "statements" attributed to Avent to which Thomas assigns error are:

1. Major Roberts testified that Thomas stated to him that she "asked [Avent] if he had anything to do with [her father's death].  And [Avent] said that [the victim],

being her father, was a piece of shit, that he took care of it, but he never said, yes he did it."

2. Major Roberts testified that he "went back to see [Thomas] about obviously some discrepancies, and [Avent]'s comments that he had given [him] in the interview certainly didn't line-up with what [Thomas] had said. So [Major Roberts] went to re-interview her and debrief her on those comments."

Thomas never objected at trial to the second "statement" and consequently waived her objection on appeal. Rule 5:25. We note as well that there is no statement made by Avent that was introduced on this subject. There was simply the observation by Major Roberts that the two co-defendants' stories "didn't line-up."

With regard to the first statement at issue, the Court of Appeals analyzed this question of admissibility under traditional hearsay rules. See Thomas v. Commonwealth, Rec. No. 0202-08-2 (Dec. 16, 2008). Certainly the trial court understood the objection in this manner. A fair reading of the record reveals that Thomas' objection to this statement addressed confrontation questions under the Sixth Amendment as well. However, the distinction is of no importance in the context of this case. The recitation of Avent's opinion that Thomas' father was "a piece of shit" most assuredly was not

57

offered for the truth of the matter stated.  Crawford v.

Washington, 541 U.S. 36, 59 (2004); Tennessee v. Street, 471

U.S. 409, 414 (1985).  The recitation that Avent said "he took

care of it," is the only portion of the statement that has any

potentially objectionable material.  However, in light of

Thomas' own testimony about what Avent did to her father,

there is absolutely no question that if it were error to admit

it, it was harmless beyond a reasonable doubt.  Zektaw, 278

Va. at 139, 677 S.E.2d at 56; Pitt, 260 Va. at 695, 539 S.E.2d

at 78 (2000); see Chapman v. California, 386 U.S. 18, 24

(1967).

O.  Admission of Evidence of Prior Bad Act

Thomas argues that the trial court erred in allowing the

Commonwealth to introduce evidence that Thomas had previously

assaulted the victim because the prejudicial value of such

evidence outweighed the probative value.  However, the Court

of Appeals held that this issue was barred from consideration

on appeal because Thomas had failed to object to the admission

of this evidence at the trial court.  Significantly, Thomas

has failed to assign error to this holding by the Court of

Appeals.  Consequently, we will not consider it.  Rule 5:25.

III. Conclusion

For the reasons stated, we will affirm the judgment of

the Court of Appeals.

<u>Affirmed.</u>