COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, Malveaux and Chaney
Argued at Lexington, Virginia


ROBIN MICHELLE NESTER

                                            MEMORANDUM OPINION* BY
v.        Record No. 1762-22-3              JUDGE VERNIDA R. CHANEY
                                            APRIL 9, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
Charles N. Dorsey, Judge

Anthony F. Anderson (Anderson Legal, on briefs), for appellant.

John Beamer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, Robin Michelle Nester appeals her convictions for robbery and

malicious wounding.[1]  Nester was convicted as a principal in the second degree for her

participation in crimes committed by her daughter, Michelle Nester (Michelle), and others.

Nester challenges the sufficiency of the evidence to sustain her convictions.  Nester also

contends that the trial court erred in admitting call logs and text messages between her and

Michelle over her objections that (i) the Commonwealth failed to lay a sufficient foundation

connecting these logs and text messages to Nester and (ii) the text messages from Michelle were

inadmissible hearsay.  For the following reasons, this Court affirms the trial court's judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The trial court found Nester not guilty of abduction.

BACKGROUND

A. The Robbery and Malicious Wounding

"On appeal, we review the facts in the light most favorable to the Commonwealth, the prevailing party below." *Sarka v. Commonwealth*, 73 Va. App. 56, 59 (2021).

On the evening of September 11, 2020, Michelle Nester invited Forrest Williams to her home under the pretense of an overnight date so that she could recover marijuana that he allegedly stole from her earlier that month. Williams had visited Michelle's home several times after meeting her on a dating app. That night, unbeknownst to Williams, Michelle had arranged for a small group of people—including Nester—to assist her in recovering the marijuana from Williams.

Michelle sold marijuana from her house, which was next door to Nester's house on Apache Road in Roanoke County. In early September 2020, when Michelle noticed that some of her marijuana was missing, she informed Nester by text message that she "lost a qp of gd weed and I thinking somebody took it. I need cameras and I need a fucking safe."[2] Nester replied, "Yeah." Michelle asked, "Can daddy buy me a safe next time he's at Walmart? I need a big safe." Nester inquired, "How big," and Michelle responded, "enough to fit [] several mason jars in." Nester agreed to help Michelle procure the safe.

At 4:46 p.m. on September 11, Michelle texted Nester, "Does daddy still have that pistol set aside for me? I want it." Nester responded, "I know before he said he wanted you to take a safety class and go with him to go shoot."

After Williams arrived at Michelle's house on September 11, he and Michelle eventually went upstairs and retired to her bedroom. While Michelle and Williams were upstairs, Michelle's housemate, Joshua Dodson, left to pick up Khairajhn "Taz" Sims (Taz) and bring him to Michelle's house. Earlier that evening, Michelle directed Dodson to bring Taz to her house that night and

---

[2] Detective VanPatten explained that "qp" was generally an abbreviation for quarter pound.

threatened Dodson with a gray pistol if he refused. After Dodson returned to Michelle's house with Taz, they waited downstairs for others to arrive.

At 1:03 a.m. on September 12, while Michelle and Williams were in bed and Williams was asleep, Nester and Michelle had the following conversation via text message:

> [Nester:] You ok.
>
> [Michelle:] Oh yes. T minus 10 minutes until shit goes down. Guess what he did when he saw I had a gun.
>
> [Nester:] What
>
> [Michelle:] Checked and made sure I didn't have it loaded
>
> [Nester:] Wow
>
> [Michelle:] He got scared. Lololololol. I'm excited. Bill almost here. Tazz is downstairs.
>
> [Nester:] Where's his car.
>
> [Michelle:] Josh picked him up. He's car broke down. But I called and he dropped everything. I love Tazz.
>
> . . . .
>
> [Nester:] So where's the gun
>
> [Michelle:] Beside me, next to my pillow. But I acted like I was taking his advice and protected myself. Sounds like they're arriving. Fun.
>
> [Nester:] Yeah
>
> [Michelle:] I'm fucking shaking with excitement hahahahahaha.

(CW Ex. 5-7).

As Michelle was in bed exchanging text messages with Nester, William Fiedler (Bill), Anjelique Glovier (Glovier), and Steven Moses (Moses) arrived together at Michelle's house. Dodson let them in. Then, the entire group went upstairs to Michelle's bedroom where Williams was sleeping.

- 3 -

Upon entering the bedroom, Taz struck Williams on the side of his head, causing his head to bleed. Williams woke up to "guns and different things being pointed at" him. Taz repeatedly demanded of Williams, "Where is the weed at?" Williams denied that he had any marijuana. Williams tried to leave the room, but someone shut the door. Williams backed into the bathroom as Taz repeatedly hit him, demanding the location of the marijuana.

Williams insisted that he had no marijuana but volunteered that he had other things: money, a car, electronics, and clothing. While held at gunpoint, Williams gave his assailants his phone and wallet, including his bank ATM card. Michelle and Moses left to withdraw money from Williams's bank account while Bill threatened to cut off Williams's fingers if he refused to provide his banking card information. Fearing for his life, Williams provided his PIN. Michelle and Moses returned to Michelle's house after discovering that Williams's bank account had insufficient funds for withdrawal.

Taz continued to question Williams about the stolen marijuana's location. Eventually, Williams said that the marijuana was at his house. Taz, disbelieving Williams, continued beating and questioning him for an hour after Michelle and Moses returned from the ATM. Williams did not change his answer.

While Taz interrogated Williams, Michelle searched Williams's vehicle for the stolen marijuana. She found a bag of marijuana in the vehicle's console. At that time, Nester and Glovier were on the driveway with Michelle. Michelle directed Nester to "[g]o get a jar of marijuana so they could match it." Subsequently, Michelle texted Nester, "You find it?" Nester, by text message, responded, "I think it's the right one. Looks and smells [i]dentical." Michelle replied, "Thank you momma."

Nester returned to the driveway with a jar of marijuana. Upon returning, Nester asked Glovier "how everything was going." Glovier responded, "I guess ok." Michelle visually inspected

the marijuana in both containers and determined that they matched. Michelle then returned the jar of marijuana to Nester.

After Michelle found the marijuana in Williams's vehicle, Moses tied Williams up with a wire and placed him in the trunk of his vehicle. Michelle and Taz then drove to Williams's home in Lynchburg. They left Williams at his house and drove away in his vehicle.

In the mid-morning hours of September 12, Dodson observed Michelle and Nester in the living room at Michelle's house. Nester appeared "anxious and real jittery." She reported seeing a vehicle pass by the house and feared it was the police. Michelle was initially dismissive of Nester's concerns, but became upset when she saw the same vehicle pass by her house. Then Nester wrote down a list of answers for Michelle to give the police if they questioned her. Michelle and Nester then threw clothing into a trash bag, and Nester left the house with the bag.

Around 10:30 a.m. on September 12, Detective VanPatten observed Nester drive a vehicle out of Michelle's driveway and around the block before parking in her own driveway next door to Michelle's house. Nester then exited the vehicle and entered her house. Nester had parked in her driveway behind a car that appeared to be Williams's missing vehicle. Detective VanPatten left to obtain search warrants for Nester's and Michelle's residences. When the detective returned several hours later, Williams's vehicle was gone.

When Detective VanPatten asked Nester about the missing vehicle, Nester stated that "a guy with red hair and a beard had come to the house earlier in the day and picked it up" and she assumed the car belonged to him. Nester asserted that she knew nothing about the incident involving Williams. She admitted, however, that she knew Williams was staying with Michelle. During a second conversation with Detective VanPatten, Nester stated that she and Michelle previously had a disagreement and had not communicated until the day before the incident.

B. Objections to Text Messages

Detective VanPatten seized Michelle's mobile phone when she was arrested, and the detective searched the phone's contents pursuant to a search warrant. Without objection, the detective testified at trial that she examined the record of text communications on Michelle's phone and took a photo showing a contact identified as Michelle's mother, with Nester's photo above the contact's identification and phone number.

Nester objected to the admission of photos of Michelle's phone identifying Nester as a contact and showing text messages between Michelle and Nester. The photos were taken by Detective VanPatten, who read some of the contact information and text messages into evidence at trial. Nester objected that the photos of contact information and text messages were inadmissible because (1) the Commonwealth failed to establish a foundation showing that (a) the phone number alleged to be Nester's phone number was, in fact, her phone number and (b) the messages alleged to be from Nester were, in fact, from her; (2) the messages from Michelle were hearsay; and (3) Michelle's messages in CW Exhibits 3-8 are irrelevant. The trial court overruled Nester's evidentiary objections.

C. Motion to Strike

After the Commonwealth rested its case-in-chief,[3] Nester moved to strike and argued that the evidence, taken in the light most favorable to the Commonwealth, was insufficient to prove that she acted as a principal in the second degree, "a person who is present, aiding and abetting by helping in some way in commission of the crime." Nester contended that her "momentary presence on the driveway" was insufficient "to show that she was intending to encourage, advise or urge [Michelle] to abduct or maliciously wound Mr. Williams." Nester contended that the

---

[3] Before the Commonwealth rested, the trial court took judicial notice, without objection, that Michelle and "Taz" Sims had pleaded guilty to crimes arising from the incident involving Williams. The trial court did not identify their offenses of conviction.

- 6 -

evidence that she was on the driveway comparing different samples of marijuana was insufficient to show that she knew this marijuana came from Williams's vehicle.

Nester acknowledged that her text messages to Michelle showed her own suspicious conduct throughout the evening of the crime. But she contended that her messages to Michelle were "inquisitive in nature" and did not show that she "knew or should have been aware that there was such a violent assault occurring against Mr. Williams." Nester admitted that the evidence "indicate[d] her knowledge and her awareness that her daughter believed that there was marijuana stolen, that there was going to be some type of obviously confrontation about the stealing of the marijuana[.]" But Nester argued that the evidence was insufficient to show that she knew Williams would be violently assaulted and abducted. Nester further contended that although she apparently sent Michelle a text message asking about the location of a gun, there was no evidence that she gave Michelle a firearm. In support of this argument, Nester stated that the evidence showed that a BB gun was found in Michelle's closet during the execution of the search warrant.

Nester argued that the evidence showed she was not physically present and did not witness any of the violent assaults against Williams, "and certainly her actions were not in furtherance of the commission of a malicious wounding and/or abduction." Regarding the robbery charge, Nester argued that evidence of her suspicious conduct may result in suspicion of guilt but was insufficient to support a conviction.

The trial court ruled that the evidence was sufficient to prove Nester's participation in the charged offenses as a principal in the second degree and denied the motion to strike.

D. Convictions and Sentences

After closing arguments, the trial court acquitted Nester of abduction but convicted her, as a principal in the second degree, of malicious wounding and robbery. For each conviction, the court sentenced Nester to incarceration for five years with four years and ten months suspended. This appeal followed.

ANALYSIS

I. Admission of Cell Phone Information and Text Messages

A. <u>Standard of Review</u>

Nester asserts that the trial court abused its discretion when it admitted an image from Michelle's phone depicting an emergency contact labeled "mom" as well as text messages between Michelle and the contact "mom." "[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Adjei v. Commonwealth*, 63 Va. App. 727, 737 (2014) (alteration in original) (quoting *Beck v. Commonwealth*, 253 Va. 373, 384-85 (1997)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Thomas v. Commonwealth*, 62 Va. App. 104, 111-12 (2013) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[B]y definition," however, a trial court "abuses its discretion when it makes an error of law." *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017) (quoting *Commonwealth v. Greer*, 63 Va. App. 561, 568 (2014)).

B.  Contact Labeled "Mom"

Nester contends that the image of the emergency contact information lacked an adequate foundation to be admissible.  Nester asserts that Detective VanPatten's testimony was insufficient to authenticate that the contact labeled "mom" in Michelle's phone referred to Nester or that she was the person who responded to Michelle's text messages.

"The requirement of authentication or identification is a condition precedent to admissibility that is satisfied by evidence sufficient to support a finding that the thing in question is what the proponent claims."  Va. R. Evid. 2:901.  "This principle holds true universally and applies equally to statements made over the telephone, through text messages, by emails, or using social media."  *Atkins v. Commonwealth*, 68 Va. App. 1, 8 (2017); s*ee Bloom v. Commonwealth*, 34 Va. App. 364, 369-70 (holding that internet conversations conducted through instant messaging are in some respects "analogous to telephone conversations"), *aff'd*, 262 Va. 814 (2001).

"The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence."  *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001) (quoting *Witt v. Commonwealth*, 215 Va. 670, 674 (1975)).  "Although the type of evidence used to prove the identity of the person making the statement may vary based in part upon the medium used to convey the message, the governing legal standard is the same—proof by a preponderance of direct evidence, circumstantial evidence, or a combination of both."  *Atkins*, 68 Va. App. at 9; *see also* Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012) ("[A]uthentication does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be.").  "Further, it is well established that '[t]he completeness of the identification goes to the weight' afforded 'the evidence rather than its

admissibility,' with the responsibility of determining the threshold question of admissibility resting with the trial court." *Atkins*, 68 Va. App. at 9 (quoting *Armes v. Commonwealth*, 3 Va. App. 189, 193 (1986)).

The record supports the trial court's finding that the emergency contact labeled "mom" in Michelle's phone referred to Nester and that Nester composed the text messages sent to Michelle's phone. Several witnesses testified that Nester was Michelle's mother. Detective VanPatten testified that she took photographs of Michelle's contacts and recent text messages when she seized Michelle's phone while executing a valid search warrant. The detective testified—*without objection*, before the objected-to image was introduced—that she took a photo of a contact on Michelles's phone, "show[ing] her mother's identification and phone number" below a picture of Nester. The contact "mom" was designated in the phone as an emergency contact. Additionally, text messages from Michelle to the contact "mom" referred to the recipient as "momma." Nester did not contest that the photographs Detective VanPatten took were from Michelle's phone. Upon review of the evidence, this Court holds that the trial court did not abuse its discretion in ruling that the challenged image of the contact "mom" referred to Nester and that Nester sent the text messages to Michelle.

C. Michelle's Text Messages

Nester further asserts that even if her text messages were properly authenticated and admissible as admissions of a party opponent, the messages from Michelle were inadmissible hearsay and not subject to any exception. The Commonwealth asserts that the text messages from Michelle were not offered for the truth of the matters asserted but simply provided context for Nester's text messages.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Atkins*, 68 Va. App. at

9 (quoting Va. R. Evid. 2:801(c)). Hearsay evidence "'is inadmissible unless it falls within one of the recognized exceptions' to the rule against hearsay." *Id.* at 7-8 (quoting *Robinson v. Commonwealth*, 258 Va. 3, 6 (1999)).

Nevertheless, "[w]e have recognized that words offered solely to give context to party admissions are not hearsay and are admissible." *Swain v. Commonwealth*, 28 Va. App. 555, 560 (1998). "Words which constitute a question or accusation that result in a party admission are not barred by the hearsay evidence rule. It is only when the prompting statements have the quality of evidence (offered for the truth of the matter asserted) that they become inadmissible hearsay." *Id.* (quoting *Atkins v. Commonwealth*, 13 Va. App. 365, 368 (1991)).

The Commonwealth offered Michelle's statements to give meaning to Nester's often single-word responses. When Michelle told her mother that marijuana had been stolen from her and that she needed cameras and a safe, Nester replied, "yeah." When Michelle asked Nester to help her get a safe large enough to fit several mason jars, Nester asked, "how big" and stated, "ok." The relevancy and evidentiary value of Nester's responses would be lost without Michelle's statements. In context, Nester's responses indicate that she knew Michelle's marijuana had been stolen and that she agreed Michelle needed cameras and a safe to continue her drug dealing operation. Further, Nester agreed to obtain a safe to fit Michelle's needs.

When Michelle asked Nester if her father still had a pistol set aside for her and said she wanted it, Nester responded, "I know before he said he wanted you to take a safety class and go with him to go shoot." Again, the evidentiary value of Nester's response would be missed without Michelle's statements. Given the context of Nester's answer to Michelle's question, Nester demonstrated she would provide Michelle with the firearm if she met the prerequisites.

Nester's statements "you ok," "what," and "wow" to Michelle lack meaning without Michelle's responses to provide context regarding the imminent attack on Williams. Nester's

- 11 -

responses to Michelle's assertions—that the planned event would start in a few minutes, that she was armed, that Williams knew she was armed, and that she was excited that Bill was almost there—tend to illustrate that Nester knew of Michelle's plan and encouraged her to continue.

Michelle's responses to Nester's questions, "where's his car," and "where's the gun," show that Nester was observing Michelle's home because she was aware Taz's car was not outside Michelle's home. Furthermore, Nester's questions illustrate that Nester knew Michelle had a gun and she wanted to know Williams's identity. Because the Commonwealth did not offer Michelle's statements for the truth of the assertions, they were not hearsay and the trial judge did not err in admitting them.

II. Sufficiency of the Evidence

In challenging the trial court's denial of her motion to strike the malicious wounding and robbery charges, Nester necessarily asserts that the fact finder should not have been allowed to even consider the charge because "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the [fact finder]." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). As a result, her challenge raises the questions of whether the evidence adduced sufficiently presented "a *prima facie* case [of malicious wounding and robbery as a principal in the second degree] for consideration by the" fact finder. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

"What the elements of the offense are is a question of law that we review *de novo*." *Linnon*, 287 Va. at 98. "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Id.* "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom."

*Id.* "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.*

Nester asserts that the evidence was insufficient to prove that she knowingly committed an overt act in furtherance of Williams's malicious wounding and robbery or that she shared Michelle's criminal intent to maliciously wound or rob Williams. Nester asserts that there is no evidence that she provided Michelle with a gun. Additionally, she was not present when Williams was maliciously wounded and robbed. She further claims that even if she provided Michelle with a gun, there is no evidence that she did so knowing Michelle would use it to maliciously wound and rob Williams. Nester asserts that, at best, the evidence supports a conclusion that she "knew Michelle was upset that Williams had stolen marijuana from her and that Michelle planned to confront him in some way about the theft." She claims that, in any event, she did not know *how* Michelle planned to confront Williams.

"If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony." Code § 18.2-51. "A conviction for robbery requires proof beyond a reasonable doubt that the defendant alone, or acting in concert with others, took property from the victim by force, threats, or violence, and that the intent to steal co-existed with the act of force." *Pugliese v. Commonwealth*, 16 Va. App. 82, 92 (1993).

"In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree," except in certain homicide offenses. Code § 18.2-18. "A principal in the first degree is the

actual perpetrator of the crime.  A principal in the second degree, or an aider or abettor as [s]he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime."  *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)).

"In order to convict an accused as a principal in the second degree, the Commonwealth must prove 'that the defendant procured, encouraged, countenanced, or approved the criminal act.'"  *Lebron v. Commonwealth*, 58 Va. App. 540, 553-54 (2011) (quoting *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008)).  "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime."  *McMorris*, 276 Va. at 505; Code § 18.2-18.  To share the criminal intent has been interpreted to mean that "the accused must either know or have reason to know of the principal's criminal intention and must intend to encourage, incite, or aid the principal's commission of the crime."  *Goode v. Commonwealth*, 52 Va. App. 380, 386 (2008) (quoting *McGhee v. Commonwealth*, 221 Va. 422, 427 (1980)).

"Mere presence when a crime is committed is, of course, not sufficient to render one guilty as aider or abettor."  *Pugliese*, 16 Va. App. at 93 (quoting *Foster v. Commonwealth*, 179 Va. 96, 99 (1942) (citations omitted)).  However, "proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances," a fact finder could infer "that [s]he assented thereto, lent to it [her] countenance and approval, and was thereby aiding and abetting the same."  *Id.* at 93-94.

"The Commonwealth can, and most often must, present circumstantial evidence to prove that a defendant aided or abetted in the commission of a crime."  *McMorris*, 276 Va. at 506; *see Augustine v. Commonwealth*, 226 Va. 120, 123 (1983); *Spradlin v. Commonwealth*, 195 Va. 523,

- 14 -

527 (1954). "However, when the Commonwealth relies on circumstantial evidence, all circumstances proved must be consistent with guilt and inconsistent with innocence and exclude all reasonable conclusions inconsistent with guilt." *McMorris*, 276 Va. at 506. "When the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator." *Carr v. Commonwealth*, 69 Va. App. 106, 114 (2018) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 539 (1991)).

Here, the facts and circumstances preceding, during, and after the crimes were sufficient for a reasonable fact finder to conclude Nester aided and abetted Michelle in maliciously wounding and robbing Williams. In the afternoon before the incident, Michelle informed Nester that she lost a quarter pound of marijuana, that she needed cameras and a safe, and asked Nester to facilitate buying a safe. Nester agreed that Michelle needed cameras and a safe and asserted that she would help Michelle get one. Later Michelle asked Nester, "does daddy still have that pistol set aside for me? I want it." Nester told Michelle, "I know before he said he wanted you to take a safety class and go with him to go shoot." From this conversation a reasonable fact finder could conclude that Nester knew about Michelle's drug dealing operation and that she was willing to help Michelle acquire cameras, a safe, and a pistol to facilitate the operation.

At 1:03 a.m. on September 12, minutes before the incident, Nester asked Michelle if she was "ok." That Nester initiated a text conversation with Michelle late at night mere minutes before the incident implies knowledge that her daughter might be distressed at that moment concerning what was about to happen. Michelle informed Nester that it was "T minus 10 minutes until shit goes down," that Taz was downstairs, and that Bill was on his way to her home. Nester did not respond by asking what Michelle meant by the comment. Rather, Nester asked Michelle, "[w]here [Taz's] car" was, indicating that Nester was looking out and had not

- 15 -

observed Taz's car. Michelle said that Dodson had collected Taz because Taz's car was not working. After learning Williams's identity, Nester asked Michelle, "so where's the gun," thus revealing Nester's knowledge that Michelle had a firearm. Michelle explained that the gun was next to her pillow and that Williams knew she had it. Finally, when Michelle's accomplices arrived and Michelle expressed excitement, Nester validated Michelle's eagerness and did not discourage Michelle from carrying through with her plan. From this exchange, a reasonable fact finder could infer that Nester knew about Michelle's plans to confront Williams using a gun and that other people were going to be involved.

When Michelle found a bag of marijuana in the center console of Williams's vehicle, Glovier testified that Nester appeared in Michelle's driveway. Familiar with Nester, Dodson heard her in the driveway through the bedroom window while he was with Williams in Michelle's bedroom. When Michelle instructed Nester to retrieve a mason jar of her marijuana, Nester did so. Upon returning with the marijuana jar, Nester asked Glovier, "how is it going?" From this question, and Nester's actions just prior to it, a reasonable fact finder could infer that Nester was aware of what was happening to Williams and that she was complicit.

The next morning, Dodson observed that Nester was "anxious and jittery" because "she had seen a car go up and down the road" and believed it was a police vehicle. Once Michelle observed the vehicle, Nester provided Michelle with a list of things to say to the police if they questioned her. Nester and Michelle then loaded clothing into a trash bag, and Nester left with the bag. Such conduct supports a conclusion that Nester wanted to avoid police contact because of her involvement in the incident involving Williams. *See Jones v. Commonwealth*, 279 Va. 52, 57 (2010).

When viewed in the light most favorable to the Commonwealth and granting to it all reasonable inferences, a reasonable fact finder could conclude beyond a reasonable doubt that

Nester knew about the planned confrontation of Williams before it occurred, knew that Michelle had a gun, was at Michelle's house during at least part of the attack on Williams, and assisted Michelle in identifying the marijuana in Williams's car as Michelle's. Thus, Nester assented and lent her countenance and approval to the operation, "thereby aiding and abetting the same." *Pugliese*, 16 Va. App. at 94. Accordingly, the trial court did not err in finding Nester guilty as a principal in the second degree in the malicious wounding and robbery of Williams.

CONCLUSION

For the foregoing reasons, this Court affirms the trial court's judgment.

*Affirmed.*