COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Lorish and Frucci
Argued at Norfolk, Virginia

JAMAR LAFONZ HILLIARD

v.      Record No. 0723-24-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE STEVEN C. FRUCCI
OCTOBER 21, 2025

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Douglas B. Ottinger, Judge[1]

Samantha Offutt Thames, Senior Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court for the City of Portsmouth convicted Jamar Hilliard

of voluntary manslaughter and maliciously discharging a firearm into an occupied dwelling and

found him not guilty of larceny of a firearm. Hilliard was sentenced to 23 years with 9 suspended

for a total active sentence of 14 years' incarceration. Hilliard argues the circuit court erred in (1)

refusing to admit a prior conviction order of the victim into evidence, (2) refusing one of Hilliard's

voir dire questions, (3) denying Hilliard's motion to strike the charge of maliciously shooting into

an occupied dwelling, and (4) ordering that the period of probation imposed in counts two and five

run consecutively with count one. For the following reasons, we affirm the circuit court's

judgment.

---

[1] Judge Douglas B. Ottinger entered the sentencing order that Hilliard assigns error to in
his fourth assignment of error. Judge Joel P. Crowe presided over the trial and made the rulings
at issue in the remaining assignments of error.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). "Accordingly, we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.* (quoting *Gerald*, 295 Va. at 473).

On July 24, 2022, C.B.[2] was spending "the whole day" with her friend, Bettye Miles. Throughout the day, C.B. and Hilliard were "arguing through text."[3] C.B. and Miles went to C.B.'s home to retrieve "a bag of clothes" belonging to Hilliard. They then drove to Hilliard's mother's house and dropped off the bag of clothes.

After dropping off the clothes, C.B. and Miles went to someone else's house. Miles went inside the house for "a few minutes" but C.B. remained in the car, talking on the phone with Hilliard. After returning to the car, Miles noticed that C.B. was "a little more agitated" than before. C.B. and Miles then left to go drop Miles off at her house.

After dropping Miles off, C.B. and Miles talked on the phone while C.B. drove home. C.B.'s phone died on her way home, but upon getting home, she charged it and called Miles. A little after 1:00 a.m. and while still on the phone with Miles, C.B. began talking to Hilliard in person. Miles heard C.B. say, "get away from the door, you ain't coming in here again" and then "oh, mother fucker, you are going to break something." Miles asked C.B. if she was "good" and if she wanted her to call the police. C.B. responded "no, I'm good" and "if he come in here, and I told him don't come back, I got something for his ass." Miles then heard "wood snapping or something

---

[2] We use initials, rather than names, to protect the privacy of the victim.

[3] C.B. and Hilliard had been dating for "seven or eight years," but Hilliard admitted to being unfaithful and cheating on C.B. throughout that time period.

breaking" and asked C.B. what that sound was. C.B. responded, "he's trying to come in," and Miles again asked if she wanted Miles to call the police. C.B. again declined, saying "no, I'm good, I'm going to call you right back." At that point their phone call ended[4]; C.B. did not call Miles back.

Amber Pond, C.B.'s neighbor and friend for seven years, saw C.B. arrive home around 12:15 or 12:30 a.m. on July 25, 2022. About an hour later, after Pond had gone to bed, she woke up to the sound of gunshots coming from "two different caliber guns." Pond testified that it was "at least eight or nine" shots, but "it was probably more than that" because she sleeps "really heavy" and she "probably missed some." Pond further testified that it sounded like a set of shots from one gun, a set of shots from a different gun, then a pause and a third set of shots. Pond immediately called 911. Ten minutes after Pond called 911, Hilliard also called 911.

Officer Pandey and Officer Johnson of the Portsmouth Police Department responded to the call and found C.B. and Hilliard, wounded, holding hands, lying on the floor inside C.B.'s house. Officer Pandey tended to C.B. and Hilliard while Officer Johnson did a "protective sweep." Officer Pandey asked Hilliard if "somebody came in the house or anything like that"; Hilliard responded "no, nobody came in the house." C.B. and Hilliard were transported to the hospital. C.B. eventually succumbed to her injuries.

Later that morning, Detective Jackson, a homicide investigator for the Portsmouth Police Department, arrived at C.B.'s home to investigate. Detective Jackson observed "substantial damage to the front door." Notably, "the door frame was broken, the bottom hinge appeared to be removed[,]" and "it looked like the frame had been broken in." Pond and Miles testified that there was nothing wrong with C.B.'s door the day before the shooting. Pond's husband testified that the door "had a little bit of damage" but that it was still able to open and close. Detective Jackson

---

[4] The phone call lasted about "seven or eight minutes."

- 3 -

also observed "a broken window next to the front porch" with "the glass going inside the residence, so it appeared to have been broken from the outside in."

*Interview with Detective Baker – July 25, 2022*

On July 25, 2022, after being transported to Sentara Norfolk General Hospital, Hilliard spoke with Detective Baker of the Portsmouth Police Department about the events leading up to his hospitalization.

Hilliard told Detective Baker that "two individuals came in the house to buy some weed, one stayed outside, one came in, the one who came in the house had a gun," and Hilliard "tried to get control of the guy with the gun but didn't, and the other guy started shooting from the outside." During this encounter, C.B. was "laying on the sofa." After "struggl[ing] with the first male," Hilliard then "went outside looking for the shooter." Hilliard then saw "the two males running down" the street. Detective Baker asked Hilliard "if there were any guns in the house." Hilliard "said no, but he had a slight laugh to it." Hilliard added that the police took C.B.'s weapon "a while back."

Hilliard provided Detective Baker with a description of the two men that came into the house. The "first male was late teens, minimum of [20], [180-200] pounds, [5'10"-6'0"] . . . wearing all black clothing with a mask." Hilliard also stated that the first male had "tattoos on the face, writing over the eyebrow with a star and stars on the right side of the eye and cheek area."

*Interview with Detective Jackson – August 1, 2022*

Detective Jackson asked Hilliard about the front door and how it "was not able to be closed." Hilliard maintained that that had happened previously. Hilliard told Jackson that when the two people came to buy weed, that "one person came in an open door" and "one person remained outside." When asked about the time gap in calling the police, Hilliard stated it was because "he couldn't find [his phone] at first, and then he said his phone was dead." Then "he had to look" for

C.B.'s phone and eventually "found it underneath the ottoman." Hilliard added that he did not need to unlock C.B.'s phone because "he used the emergency 911 feature."

*Second Interview with Detective Jackson – February 14, 2023*

Detective Jackson interviewed Hilliard a second time, and this time Hilliard said that a second person "entered the house" and both of them had "face masks on." Detective Jackson confronted Hilliard with the inconsistencies in his accounts and eventually got Hilliard "to admit what happened."

Hilliard stated that he "walked in" to C.B.'s house, and Detective Jackson said that Hilliard "continue[d] to deny that he kicked the door in" or otherwise used force to enter the home. At some point, C.B. went into the kitchen "for about two or three minutes and then she came back with a gun." Hilliard stated that he only shot back at C.B. "in response to her shooting." Hilliard said that C.B. was "peeking out of the window" when he was "standing outside" firing the shots into the house. When asked if C.B. shot through the window, Hilliard "said no."

Hilliard also explained that the time gap between Pond and him calling the police was not because he was searching for his phone, as he previously said, but it was during those ten minutes that he took the "firearms in the back yard." He also said that C.B. unlocked her phone, rather than him using the emergency 911 feature. Following his admission to Detective Jackson, Hilliard was charged with second-degree murder, two counts of possession of a firearm by a convicted felon, larceny of a firearm, and maliciously discharging a firearm into an occupied building or dwelling house.

*Hilliard's Testimony at Trial*

Hilliard testified that he walked up to C.B.'s house, "knocked on the door" "about three or four" times, and C.B. opened the door and "let [him] in." Hilliard then gave C.B. a "whole rundown of [his] day." Among other things that day, Hilliard said he was "chilling with" his friend

Daniqua, about which C.B. was displeased. Hilliard elaborated that C.B. "know[s] of Daniqua" but C.B. didn't "trust [him] around her."

Hilliard said that C.B. went to "the kitchen for a little bit," so he went and used the bathroom, then he came back into the living room. Suddenly, C.B. returned from the kitchen and shot Hilliard in the groin; Hilliard then ran out the door and C.B. "shot him in the back." Hilliard fell on the ground, and C.B. shot through the window, hitting Hilliard in the leg. Then he shot back, "simple as that."

When asked why he lied about the story of two men coming in, Hilliard said its "because I'm always protecting her and me." Hilliard said that he eventually told the truth because C.B.'s "birthday was the 13th," the day before his February 14, 2023 interview with Detective Jackson, and he was "tired of living with the weight on [his] shoulders, because [he didn't] know what to do in that situation."

*Voir dire*

During voir dire, Hilliard asked the panelists the following question: "This is a case of self-defense using deadly force. Does anyone believe that you should never be allowed to use deadly force to defend yourself?" No panelists answered in the affirmative. Hilliard then proposed the following voir dire question:

> Is there anyone who has had to use deadly force to defend
> themselves or known an immediate family member or close friend
> who had to use deadly force to defend themselves, and did you agree
> with their actions, were you able to place yourself in their shoes and
> see the threat of harm they faced?

Following the Commonwealth's objection, the circuit court did not permit the question on the grounds that it asked the jury "to speculate as to what took place," that it was inappropriately worded, and that the prior question "covers it."

- 6 -

*Evidence of C.B.'s Propensity for Violence*

At trial, Hilliard introduced evidence, without objection, of a police report and protective order stemming from an incident on January 4, 2020, between C.B. and Hilliard. The police report stated that when police arrived "Hilliard [] was bleeding from the ear and bottom lip and also was bleeding from the arm." The police report stated that the parties "started to fight" after C.B. confronted Hilliard about a text message on his phone. In the report, "[C.B.] stated that Hillard hit her in the face five times, so she grab[bed] her silver and brown handgun out of the draw[er]" and "followed Hilliard outside with the handgun in her hand down by her side." The report also stated that "[C.B.] was the Predominate [sic] Aggressor and was taken into custody" and requested a warrant for "Domestic assault on a family member, [an Emergency Protective Order], and Brandishing." Later that day, an emergency protective order was issued for the protection of Hilliard from C.B. The charges for domestic assault and brandishing were dropped after Hilliard failed to appear at court.[5]

In addition, Hilliard sought to introduce a "certified conviction order for [C.B.] from [the] Portsmouth JDR court" from 2005 that contained a charge of malicious wounding and conviction for assault and battery. Hilliard argued that the conviction order was relevant to his claim of self-defense by evincing C.B.'s "propensity of violence and turbulent behavior." The Commonwealth objected, arguing that Hilliard had "not laid a foundation" and that Hilliard had not proved he had "any knowledge about the . . . facts and circumstances surrounding any of those instances." The circuit court agreed with the Commonwealth and refused to admit the conviction order into evidence, holding that Hilliard had not laid a foundation.

---

[5] Hilliard claimed that he failed to appear at court "to protect C.B."

*Jury Verdict*

The jury convicted Hilliard of voluntary manslaughter and maliciously discharging a firearm in an occupied dwelling and found him not guilty of larceny of a firearm.[6] Hilliard was sentenced to 10 years on the voluntary manslaughter charge, 3 years with 2 years suspended on the malicious shooting charge, and 10 years with 7 years suspended on the felon in possession of a firearm charge. Hilliard was also placed on supervised probation for: 5 years for the manslaughter charge, 2 years for the malicious shooting charge, and 5 years for the felon in possession of a firearm charge. The circuit court ordered that the "period of probation imposed in counts two and five shall run CONSECUTIVELY with count one." Hilliard appeals.

## ANALYSIS

I.  Whether the circuit court erred in refusing to admit C.B.'s prior conviction order into evidence

Hilliard argues that the circuit court should have admitted C.B.'s 2005 assault and battery conviction because it was relevant to his self-defense claim.[7]

"In general, 'we review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion.'" *Anderson v. Commonwealth*, 69 Va. App. 396, 402 (2018) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)). "[B]y definition . . . a trial court 'abuses its discretion when it makes an error of law.'" *Atkins v. Commonwealth*, 68 Va. App.

---

[6] At a subsequent hearing, Hilliard pleaded guilty to one count of possession of a firearm by a convicted felon and the second count was dismissed pursuant to an agreement.

[7] Hilliard also argued that the charging document, attached to the conviction order, which charged C.B. with "maliciously stab[bing], cut[ting] or wound[ing] . . . a person with whom [C.B.] ha[d] a child in common, with intent to maim, disfigure, disable, or kill," should have been admitted.

1, 7 (2017) (first alteration in original) (quoting *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017)).

The circuit court refused to admit the conviction order into evidence, holding that:

> [Hilliard had] not laid a foundation. In order for the fear to be reasonable under the *Jones* case,[8] the defendant has to know about the events, and then it doesn't even matter under *Jones* necessarily that the event is absolutely true, what it means is that the fear in the mind of the defendant. But there has been no foundation, so I sustain the objection.

As such, it appears that the circuit court misinterpreted the law.

The circuit court erroneously stated that Hilliard had to know about the prior charge for malicious wounding and subsequent conviction for assault and battery in order for the conviction order to be admissible. The law is clear that "[w]here an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the decedent for turbulence and violence, *even if the accused is unaware of such character*." *Avent v. Commonwealth*, 279 Va. 175, 206 (2010) (emphasis added) (quoting *Barnes v. Commonwealth*, 214 Va. 24, 25 (1973)). Thus, the circuit court plainly made a legal error by stating "the defendant has to know about the events."

However, "[o]ur conclusion that the trial court erred in that respect . . . does not end our analysis." *Peters v. Commonwealth*, 72 Va. App. 378, 388 (2020). "Under the right result for the wrong reason doctrine, 'it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons.'" *Id.* (alterations in original) (quoting *Perry v. Commonwealth*, 280 Va. 572, 579 (2010)). As we previously noted, "evidence of specific acts is admissible to show the character of the decedent for turbulence and violence." *Avent*, 279 Va. at 206 (quoting *Barnes*,

---

[8] Although not specifically stated, it appears the *Jones* case that the circuit court relied on is *Jones v. Commonwealth*, 71 Va. App. 70 (2019).

214 Va. at 25).  But "this statement of the law has been qualified," and "[t]he ultimate issue becomes whether such evidence of prior conduct was sufficiently connected in time and circumstances with the homicide as to be likely to characterize the victim's conduct toward the defendant." *Id.* at 206-07 (quoting *Barnes*, 214 Va. at 25).

Here, the rejected evidence was stale, as the conviction was entered 17 years before the homicide at issue.  *See id.* at 207 (holding that evidence that was "between 10 and 12 years before the killing" was not connected in time and circumstances); *see also Carter*, 293 Va. at 547 (holding that evidence "regarding a stabbing that occurred ten years prior" was not relevant to the time and circumstances).  Moreover, C.B. was convicted of a misdemeanor, and Hilliard was not the victim, further supporting the irrelevance of the 17-year-old conviction.[9]

Accordingly, the circuit court reached the right result, but for a different reason, in excluding C.B.'s prior conviction order as evidence.

II.  Whether the circuit court erred in refusing Hilliard's voir dire question

Hilliard argues that the court should have permitted him to ask the following voir dire question:

> Is there anyone who has had to use deadly force to defend
> themselves or known an immediate family member or close friend
> who had to use deadly force to defend themselves, and did you agree
> with their actions, were you able to place yourself in their shoes and
> see the threat of harm they faced?

---

[9] In addition, the conviction order was cumulative of other evidence.  An already admitted police report and protective order indicated that C.B. was previously violent towards Hilliard, and the facts surrounding the events from that incident are similar to the homicide here, to-wit: the altercation was between the same two parties (C.B. and Hilliard), that was incited after C.B. was upset over something Hilliard had done or said, which escalated to her brandishing or using a firearm.  Hence, the rejected conviction order was cumulative of this evidence because the "kind and character of the facts" were repetitive of the police report and protective order.  *Curry v. Commonwealth*, 84 Va. App. 339, 359 (2025).

Hilliard contends that this question was necessary to "weed out any bias, or one of the statutory factors under [Code §] 8.01-358" and that the prior question "did not sufficiently cover the issue of bias based on personal experience."

Before the circuit court denied this voir dire question, it permitted a question which asked: "[t]his is a case of self-defense using deadly force. Does anyone believe that you should never be allowed to use deadly force to defend yourself?" No panelists answered in the affirmative. The circuit court then disallowed the question at issue on the basis that it asked the jury "to speculate as to what took place," that it was inappropriately worded, and that the previous question "covers it."

"It is well-established that the manner of conducting voir dire, including the exclusion of questions to the venire, is committed to the trial court's discretion and we review its rulings only for abuse of that discretion." *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013). "A defendant has 'no absolute right to have the court ask every question he propounded.'" *Thomas v. Commonwealth*, 279 Va. 131, 162 (2010) (quoting *Bassett v. Commonwealth*, 222 Va. 844, 853 (1981)). "Trial courts must afford a party a 'full and fair' opportunity to ascertain whether prospective jurors 'stand indifferent in the cause.'" *Buchanan v. Commonwealth*, 238 Va. 389, 401 (1989) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 581 (1984)). "However, it is within the trial court's sound discretion to decide when a defendant has had such an opportunity." *Id.*

> Where a trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel.

*Thomas*, 279 Va. at 163.

The circuit court was correct when it stated the question was inappropriately worded, containing at least three questions within the one proposed question. Asking panelists whether they "agreed" with the actions of someone they knew who used deadly force in self-defense or could

- 11 -

"see the threat of harm they faced" are inappropriate and unnecessary to discovering potential bias when all panelists agreed that there are circumstances in which someone would be allowed to use deadly force to defend themselves.

Whether a panelist agreed that the facts and circumstances leading to a panelist's family member or close friend using self-defense was proper is not an accurate indicator of whether they would be biased in evaluating the facts surrounding Hilliard's claim of self-defense.

The permitted prior question amply, and more succinctly, covered the issue of whether any panelist had bias related to the use of deadly force in self-defense. Accordingly, the circuit court did not err in refusing the defense's voir dire question.

III. Whether the circuit court erred in denying Hilliard's motion to strike the charge of maliciously shooting into an occupied dwelling and Hilliard's request to reduce the charge to the lesser-included offense

Hilliard argues that it was C.B. that acted with malice and that he returned fire under a "sudden provocation or from passion."

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v.*

*Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Moreover, "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)). "Furthermore, a fact finder's evaluations of credibility . . . include, as in this case, resolving conflicts in a single witness' testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible." *Id.*

"The Supreme 'Court has long defined malice as "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will."'" *Meade*, 74 Va. App. at 813 (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020)).

"In contrast to the deliberate mind required for malice, '[h]eat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason.'" *Id.* at 814 (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Malice and heat of passion cannot exist simultaneously because, unlike malice, the heat of passion requires a person 'to act on impulse without conscious reflection.'" *Id.* (quoting *Rhodes*, 41 Va. App. at 200). "Critically, the existence or absence of 'malice "is a question of fact to be determined by"' the factfinder." *Id.* (quoting *Fletcher*, 72 Va. App. at 507).

In addition to lying about the first three versions of what transpired in the early hours of July 25, 2022, at trial, Hilliard continued to give inconsistent and contradictory statements from his previous interviews. For example, Hilliard told Detective Jackson that he was "standing outside" shooting back inside the house at C.B., rather than lying on the ground as he testified at trial. Further, Hilliard told Detective Jackson that C.B. did *not* shoot at him through the window. However, at trial, Hilliard stated that C.B. *did* shoot through the window, striking him in the leg.

Thus, the jury was entitled to reject Hilliard's testimony that C.B., after chasing and shooting him outside, then retreated inside, positioned herself behind the window before shooting and striking Hilliard in the leg which then provoked Hilliard to fire back. *See Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998) ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."). Instead, the evidence allows a reasonable trier of fact to conclude that after C.B. retreated inside, Hilliard withdrew his weapon and waited for C.B. to peek out the window before shooting and striking her five times consecutively. Moreover, there is evidence to support the finding that Hilliard, not C.B., shot through the window first from Detective Jackson's testimony explaining that window glass shattered inside the house, making it appear that it was broken from the outside in.

Because there is at least some sufficient evidence to support the jury's determination that Hilliard acted with a "deliberate mind" in shooting C.B. through the window, rather than simply returning fire "without conscious reflection," we do not reverse that finding on appeal. *Meade*, 74 Va. App. at 813-14.

Accordingly, the circuit court did not err in denying Hilliard's motion to strike and in denying Hilliard's request to reduce the charge to the lesser-included offense.

IV. Whether the circuit court erred in ordering that the period of probation imposed in count two and count five run consecutively with count one

Hilliard argues that the period of supervised probation exceeds the allowable time under Code § 19.2-303 and accordingly makes the sentencing order void ab initio.[10]

However, Hilliard's argument is complicated by his failure to contemporaneously object to the sentencing order. "Like any ordinary legal error in a proceeding below, objections to voidable errors must be preserved and brought before courts of appeal pursuant to our procedural rules." *Hannah v. Commonwealth*, 303 Va. 106, 120 (2024). On the other hand, "[o]bjections to void ab initio judgments may be raised by any party in the case at any point during a valid direct or collateral proceeding where the voidness of the order is properly at issue, including by a court for the first time on appeal." *Id.* Thus, this Court is presented with the threshold question of whether the sentencing order is voidable or void ab initio.

> Our Supreme Court has recognized five circumstances that may give rise to judgments which are void ab initio: when "(1) [the judgment] was procured by fraud, (2) the court lacked subject matter jurisdiction, (3) the court lacked jurisdiction over the parties, (4) the judgment is of the character that the court lacked power to render, or (5) the court adopted an unlawful procedure."

*Id.* at 119-20 (alteration in original) (quoting *Watson v. Commonwealth*, 297 Va. 347, 350 (2019)). "A judgment which is void ab initio is a judgment so affected by a fundamental infirmity that it is no judgment at all." *Id.* at 119 (citing *United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010)). "It is a legal nullity from which no rights can be created or divested, binding no one and barring no one." *Id.* In contrast, voidable orders are "actions taken by a court in error but within the

---

[10] Code § 19.2-303 provides in relevant part "[a]ny period of supervised probation shall not exceed five years from the release of the defendant from any active period of incarceration." In its sentencing order, the circuit court imposed probation for: 5 years for the manslaughter charge, 2 years for the malicious shooting charge, and 5 years for the felon in possession of a firearm charge. Further, the circuit court ordered that the "period of probation imposed in counts two and five shall run CONSECUTIVELY with count one." This exceeds the allowable time of supervised probation under Code § 19.2-303.

bounds of its authority." *Id.* at 120 (quoting *Singh v. Mooney*, 261 Va. 48, 51 (2001)). "Voidable judgments are more common and usually involve a court's failure to comply with precedent or an applicable statute." *Id.* (quoting *Jones v. Commonwealth*, 293 Va. 29, 47 (2017)).

We have recently held that, if a circuit court "surpassed the bounds of its statutory authority" by suspending execution of a sentence for "periods beyond the five-year maximum permitted under amended Code § 19.2-306(C)," such an error "does not render the revocation orders a nullity." *Cisneros v. Commonwealth*, 82 Va. App. 147, 163 (2024). "At most, such orders would be voidable rather than void ab initio." *Id.* Further, our Court held that "where the trial court has jurisdiction to revoke a suspended sentence under the provisions of Code § 19.2-306," the "failure to comply with the statutory parameters for reimposing and/or resuspending the original sentence is voidable error that must be preserved in accordance with Rule 5A:18." *Id.* at 168-69. We hold that rationale to be applicable here. The circuit court had the jurisdiction to impose supervised probation under Code § 19.2-303, and any failure to comply with the statutory parameters for the length of supervised probation is a voidable error that must be preserved in accordance with Rule 5A:18.

The facts here are distinguishable from *Rawls v. Commonwealth*, 278 Va. 213 (2009), which held that "a sentence imposed in violation of a prescribed statutory range of punishment is void ab initio because 'the character of the judgment was not such as the [C]ourt had the power to render.'" *Id.* at 221 (alteration in original) (quoting *Anthony v. Kasey*, 83 Va. 338, 340 (1887)). The key distinction from the rule in *Rawls* is that the *punishment* was outside the bounds of the court's authority, whereas here the circuit court's imposition of probation was outside the statutory parameters.

Indeed, our Supreme Court later reasserted the ruling from *Rawls*, stating that it "comports with Chief Justice Marshall's observation that 'the power of punishment is vested in the legislative, not in the judicial department.'" *Hannah*, 303 Va. at 121 (quoting *United States v. Wiltberger*, 18

U.S. (5 Wheat.) 76, 95 (1820)).  Moreover, it is well established that probation is "an act of grace . . . to one who has been convicted and sentenced to a term of confinement."  *Price v. Commonwealth*, 51 Va. App. 443, 448 (2008) (quoting *Pierce v. Commonwealth*, 48 Va. App. 660, 667 (2006)).  As such, we hold that because the circuit court exceeded the statutory parameters in imposing a term of supervised probation rather than incarceration, the sentencing order is thus voidable, rather than void ab initio.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling."  Hilliard admits that he failed to make a specific objection to this ruling in the circuit court, and he does not raise the ends of justice exception to Rule 5A:18.  We decline to invoke the exception sua sponte here.

Therefore, because the sentencing order is not void ab initio, and Hilliard failed to preserve his objection, we do not reach the issue of whether the circuit court erred in its imposition of supervised probation.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*

Lorish, J., concurring in the judgment.

Our caselaw requires us to conclude that all probation is an act of mercy and rehabilitative in nature. A sentence to a longer term of probation than the General Assembly authorized therefore cannot be said to be punitive. Thus, a court's error in imposing a condition to a lawfully suspended sentence is merely voidable, not void ab initio.

I write separately because our caselaw should recognize that most terms of probation (particularly those following a guideline sentence of incarceration) are punitive in nature. Just being on probation is a restriction of liberty, and it also subjects an offender to the threat of incarceration separate from, *and in addition to*, the amount of incarceration that the court deemed proper for the underlying offense.

This case is a good example. Hilliard received a sentence at the top end of the range recommended by the sentencing guidelines—and then he received a term of probation on top of that. If Hilliard violates the terms of his probation and a court reimposes the remainder of his suspended time, our caselaw currently requires us to consider this to be punishment justified by his original offense—and not the probation violation. But Hilliard already received a sentence, informed by the sentencing guidelines, and one that fully accounts for the original offense of conviction and his criminal history. For Hilliard, and many others like him, probation is not an act of grace but a punitive hook to ensure future lawful behavior.

I write here to urge that our line of caselaw be reconsidered. I begin with a brief overview of probation. I then examine contemporary sentencing practices and conclude by explaining why the imposition of probation beyond the statutory maximum authorized is punitive and should render the erroneous order void ab initio.

A.  As it was originally conceived, probation operated as an act of grace for defendants.

Our Supreme Court first explained how probation operated in the Commonwealth in 1921.[11] Because our Commonwealth "desires the reformation of the criminal," the law "authorizes the probation of certain criminals and the suspension of the imposition or execution of their sentences, so that they may not be deprived of their liberty and the power to earn their subsistence, or be morally corrupted by association with hardened criminals frequently found in the jails . . . ." *Richardson v. Commonwealth*, 131 Va. 802, 809-10 (1921).  Instead, probation allows a defendant to "take their places and perform some useful work in the community." *Id.* at 810.  When a trial court chooses to suspend a sentence in this way it "extends to him the opportunity which the State affords him to repent and reform." *Id.*  "It is the free gift of the Commonwealth, and not a contract to relieve him from the punishment which fits his crime." *Id.*  The Commonwealth permitted this as "a mercy which is free," whereby a court "may as a matter of grace, postpone or withhold the imposition of the prescribed penalty." *Id.*

A decade later, the description of probation as "a matter of grace" also appeared in an opinion from the United States Supreme Court.  *Burns v. United States*, 287 U.S. 216, 223 (1932).  There, the Court explained that the Federal Probation Act "was designed to provide a period of grace in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which actual service of the suspended sentence might make less probable." *Id.* at 220.

---

[11] Probation was first used in the United States during the mid-1800s when a cobbler, John Augustus, intervened in a Massachusetts court to "sponsor" a man who would have otherwise been incarcerated for his crimes.  Augustus took responsibility for the man and returned him to court several weeks later, explaining to the judge that he had been rehabilitated.  Cecelia Klingele, *Rethinking the Use of Community Supervision*, 103 J. Crim. L. & Criminology 1015, 1023 (2013).  Massachusetts then formalized a "probation" system, and, by 1925, all 48 states and the federal government had enacted probation statutes.  Andrew Horwitz, *The Costs of Abusing Probationary Sentences: Overincarceration and the Erosion of Due Process*, 75 Brooklyn L. Rev. 753, 757 (2010).

The original concept was clear. Diverting an offender from incarceration to be rehabilitated in the community was indeed an act of grace. Placing a defendant on probation in this manner was "conferred as a privilege and [could not] be demanded as a right." *Id.* Our Supreme Court reemphasized this point by explaining that the probation statutes "afford to trial courts a valuable means of bringing about the rehabilitation of offenders against the criminal laws." *Dyke v. Commonwealth*, 193 Va. 478, 484 (1952).

When probation is offered as an opportunity to avoid incarceration, and then a defendant violates probation, it makes sense that a probation violation hearing is not considered a new stage of a criminal prosecution, *Green v. Commonwealth*, 263 Va. 191, 195-96 (2002), or a new criminal conviction, *Merritt v. Commonwealth*, 32 Va. App. 506, 509 (2000). It also explains why federal courts often describe the violation of federal supervised release (comparable in many respects to post-incarceration probation) as a breach of the court's trust.[12] And it explains why imposing a punishment for violating probation is not a double-jeopardy violation,[13] as well as why violators do not enjoy the same due process protections that go along with a full criminal trial.[14] Because the option to try probation instead of incarceration was truly an act of grace, if the defendant later violated the terms of that probation, it was not a "new sentencing" to simply impose the sentence

---

[12] The Federal Sentencing Guidelines explain that in determining a sentence for a violation of supervised release "[t]he nature of the conduct leading to the revocation [is] considered in measuring the extent of the breach of trust . . . ." U.S.S.G. ch. 7, pt. A, n.3(b).

[13] *See Green v. Commonwealth*, 65 Va. App. 524, 532-33 (2015) ("A revocation of a suspended sentence does not involve multiple punishments for the same offense but rather the single punishment already imposed for the offense or offenses convicted of" with the understanding that the "degree to which the punishment will be executed" may change at a later time.).

[14] *See Henderson v. Commonwealth*, 285 Va. 318, 325 (2013) (concluding that while the "full panoply" of constitutional rights available at trial do not apply to a revocation hearing, a more limited right of confrontation does apply).

the defendant would have originally received in the first place.  The defendant would simply be getting what he originally deserved.

B.  The modern transformation of probation has made it more punitive than gracious.

Since our caselaw characterized probation as a rehabilitative "act of grace," the oft-repeated description has stuck even as the use of probation has dramatically morphed.  The sheer amount/number of people now on probation is notable: as of August 2025, there were 59,944 people supervised on probation or parole in Virginia.[15]  Some of these people were placed on probation as an alternative to incarceration.  And some were placed on probation following a term of incarceration.  But the vast majority did not receive probation as an act of judicial grace.

Virginia courts use the sentencing guidelines to help them determine the appropriate sentence for a defendant's criminal conduct.  The General Assembly directs the Virginia Criminal Sentencing Commission to create sentencing guidelines to "assist the judiciary in the imposition of sentences" through a system that "emphasizes accountability of the offender and of the criminal justice system to the citizens of the Commonwealth."  Code § 17.1-801.  The Commission is directed to "achieve the goals of certainty, consistency, and adequacy of punishment . . . ."  *Id.* Thus, the sentencing guidelines consider the nature of an underlying offense and the individual's criminal history to compute a recommended sentence of either probation or incarceration.  While it is common for courts in Virginia to suspend a portion of a criminal sentence upon certain conditions (such as completing a period of probation), the sentencing guidelines do not factor any suspension of time into their recommendation.  When the guidelines recommend incarceration and not

---

[15] The Virginia Department of Corrections issues a monthly population summary that includes the number of people on probation or parole.  *See* Va. Dep't of Corr., Monthly Population Summary -August 2025, https://vadoc.virginia.gov/media/2263/populationsummaryaug2025.pdf.  While both result in community supervision of an offender, parole (abolished in 1995) operates separately in Virginia and is outside the scope of what I discuss here.

probation, the suggested range is the amount of active, unsuspended, incarceration that the Virginia Criminal Sentencing Commission has deemed appropriate. And the Commission calculates the amount of active incarceration to recommend based on the "seriousness of the offense, the dangerousness of the offender, deterrence of individuals from committing criminal offenses and the use of alternative sanctions, where appropriate." *Id.*

Judges in Virginia almost always follow the recommendation in the sentencing guidelines. For example, judges imposed a sentence consistent with the guideline recommendation in 83% of cases in 2024. Va. Crim. Sent'g Comm'n, 2024 Annual Report 12, https://perma.cc/PD9G-3V3D. In fact, "[f]or over a decade, the general concurrence rate of cases throughout the Commonwealth has hovered around 80%." *Id.* In fiscal year 2024, judges also imposed a longer sentence than the guideline recommendation in 8.4% of cases. *Id.* That means that in more than 90% of cases decided that year, a defendant received a sentence that was within, or above, the guideline range. Where the guidelines recommend probation and not incarceration, judges usually follow that as well.[16]

Of course, it is true that any time someone receives a sentence to less than the maximum allowed by statute it is not as bad as it could have been. But the General Assembly's decision to create sentencing guidelines in the first place was designed to assist judges in imposing fair and consistent sentences *within the statutorily approved maximum and minimum.* When a judge imposes a guideline sentence, they impose a sentence that the Virginia Sentencing Commission has

---

[16] In fiscal year 2024, 7,354 people were sentenced to probation in lieu of incarceration. Va. Crim. Sent'g Comm'n, *Data Dashboard*, available at: http://www.vcsc.virginia.gov/datadashboard.html (filtered by sentence length). The available data makes it impossible to tell exactly how many of those individuals received a sentence of probation because the guidelines recommended it, and how many received a sentence of probation despite a guideline recommendation of incarceration. But we do know that when the guidelines recommend probation, judges followed that recommendation 71% of the time. *Id.* at 12. And judges imposed a sentence under the guideline recommendation 8% of the time. *Id.*

determined fairly accounts for the defendant's criminal history and the severity of the offense. It thus follows that imposing a guideline sentence—even when that sentence recommends probation over incarceration—is generally not an act of grace. Any guideline sentence is more aptly described as a judicial decision to treat the defendant the same way the Sentencing Commission has concluded another offender with the same offense and a similar criminal history should be treated.

On the other hand, if a judge sentences someone below the guideline range, and imposes a term of probation as part of that sentence, that may be an act of grace. The same can be said for a decision to place someone on probation instead of imposing a recommended sentence of incarceration. And when a judge chooses a sentence within or above the guideline range that the judge felt should be higher but for the inclusion of a post-incarceration period of probation, probation is a kind of grace. But many times, probation is simply tacked on to the end of a sentence that already accounted for the crime.

Probation that is added to a sentence that already fully accounts for a crime is fundamentally punitive not rehabilitative. It involves "punishment," which can be understood as a "sanction— such as a fine, penalty, confinement, or loss of property, right, or privilege—assessed against a person who has violated the law." *Punishment, Black's Law Dictionary* (11th ed. 2019). Reporting to a probation officer and being subject to the requirements that that officer imposes is definitionally a loss of privilege and right. A probationer may be required to attend frequent meetings (that may be far from home or during work hours), be subject to random drug testing, participate in treatment programs at their own cost, and avoid associating with certain individuals.[17] Each requirement is a

---

[17] Some commentators have observed that while many supervision conditions are no doubt reasonable on the individual level, "in the aggregate, the sheer number of requirements imposes a nearly impossible burden on many." Cecelia Klingele, *Rethinking the Use of Community Supervision*, 103 J. Crim. L. & Criminology 1015, 1035 (2013). In fact, probationers "must comply with an average of 10 to 20 conditions a day." Hum. Rts. Watch & Am. C.L. Union, *Revoked: How Probation and Parole Feed Mass Incarceration in the United*

loss of some right or privilege.  And a violation of any condition comes with the threat of incarceration.  When probation is offered in lieu of incarceration, these losses of liberty are a fair exchange for the chance to be rehabilitated and avoid incarceration.  But that calculus falls apart when probation is imposed on top of the period of incarceration a court found was warranted for the underlying offense.

    C.  Because probation is punitive and not an act of grace in most instances, any probation sentence that exceeds the statutorily permissible period should be void ab initio.

When probation is properly understood as (usually) punitive, a court's order imposing a period of probation that exceeds the period allowed by statute would be void ab initio under *Rawls v. Commonwealth*, 278 Va. 213 (2009).  In *Rawls*, the Supreme Court held that "a sentencing order which exceeded the limits of a prescribed statutory range was void ab initio because the court lacked the power to render a judgment of that character."  *Hannah v. Commonwealth*, 303 Va. 106, 120 (2024) (explaining the decision in *Rawls*).  The court was without such authority because the "power of punishment is vested in the legislative, not in the judicial department."  *Id.* at 121 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)).

We have since concluded that, at a revocation hearing, a court's error in resuspending more time than allowed by statute only renders that judgment voidable, not void ab initio, because a sentence suspension is not punitive but merely "remedial in nature."  *Terry v. Commonwealth*, 81 Va. App. 241, 252-53 (2024).  We then extended this holding to apply even when a suspended sentence was extended at a revocation hearing to stretch a sentence beyond the statutory maximum originally authorized for the offense.  *Cisneros v. Commonwealth*, 82 Va. App. 147, 172-74 (2024).  These cases were about suspensions of a sentence, not specifically about the terms of probation imposed as a condition of a suspended sentence.  But because "the condition of good behavior is

*States* (2020), https://www.hrw.org/report/2020/07/31/revoked/how-probation-and-parole-feed-mass-incarceration-united-states.

- 24 -

implicit in every order suspending sentence . . . whether probation is provided for or not," *Collins v. Commonwealth*, 269 Va. 141, 146 (2005), and a violation of that good behavior condition can lead to further incarceration in excess of what the court found appropriate for the underlying offense, I disagree that a sentence suspension is not punitive and is only remedial in nature.[18]  The punitive nature of most suspended sentences becomes more apparent when coupled with a condition of probation.  Such is the reality Hilliard currently faces.[19]

We should reconsider our precedent that concludes that every action taken at a revocation hearing—even one that exceeds statutory requirements—is not punitive and thus not correctable absent a timely objection.  Indeed, the uncommon occasions where courts impose probation as an act of grace do not cure the generally punitive nature of probation (or sentence suspension, for that matter).  Recognizing this reality would not cause any drastic changes in our criminal jurisprudence.  Rather, it would simply allow reviewing courts to ensure that sentencing orders are made compliant with what the General Assembly intended.

More broadly, we should abandon our description of probation as, globally, an "act of grace."  In doing so, we can still recognize that probation officers in Virginia are providing valuable support for the nearly 60,000 people they are currently supervising.  But we would acknowledge

---

[18] Even if I am wrong about that, *Cisneros* was wrongly decided under our existing precedent.  When the circuit court, on May 1, 2023, revoked Cisneros's first term of probation initially imposed in January 2015, the court was able to reimpose whatever time it deemed appropriate but erred by suspending the sentence because the underlying offense carried only a five-year statutory maximum penalty.  *See* Code § 19.2-306(C); *Hamilton v. Commonwealth*, 79 Va. App. 699 (2024).  Thus, the court had no power to resuspend the sentence after January 2020.  *See* Code § 19.2-306(C).  Cisneros's second term of probation, initially imposed as part of a sentence on June 29, 2018, could be revoked on May 1, 2023, and the court could reimpose all his suspended time, but the court could not suspend any time beyond June 29, 2023 because that offense also had a five-year statutory maximum penalty.

[19] Hilliard could later move the court to reduce his term of probation to the maximum period allowed by statute.  *See, e.g.*, Code § 19.2-304.

that probation is another significant part of a criminal sentence, and one that comes with real restrictions on liberty.